FOX, Justice.
[¶1] A jury convicted Dennis Larkins and Emily Larkins of multiple counts of child abuse and one count of abuse of a vulnerable adult. On appeal, they contend that the evidence was insufficient as to some of the counts, that the district court erred when it denied their motion for new trial based on ineffective assistance of counsel, and that the prosecutor committed misconduct during closing argument which warrants reversal. Finding no reversible error, we affirm.
ISSUES
[¶2] Mr. Larkins and Mrs. Larkins raise three interrelated issues on appeal, which we rephrase:
1. Did the State present sufficient evidence:
a. that Mr. Larkins caused physical injury to J.K. and J.T.?
b. that Mr. Larkins and Mrs. Larkins caused mental injury to J.T. and M.D.T.?
c. that Jesus Manzanares was a vulnerable adult?
2. Did the district court err when it denied the Larkins' Rule 21 motions for a new trial?
3. Did the prosecutor commit misconduct during closing argument which requires reversal?
FACTS
I. Trial Proceedings and Relevant Testimony
[¶3] Jesus Manzanares, M.D.T., J.T., and M.M.T. are the biological children of Mrs. Larkins' sister, Laura Trujillo, who lives in Colorado. Authorities in Colorado removed the minor children from Ms. Trujillo and placed them with Mrs. Larkins (M.D.T. in 1998; M.M.T. and J.T. in 2007). Jesus Manzanares moved in with the Larkins in 2011. He turned 18 on January 25, 2012. Another child, J.K., and his mother, lived with the Larkins for approximately six months in 2010 and 2011.[1]
*34 A. The Mental and Physical Injuries to J.T.
[¶4] When they lived on 10th Street, Mr. Larkins and Mrs. Larkins would punish J.T. by requiring him to hold onto the washer and dryer while Mr. Larkins and Mrs. Larkins spanked him. They would either use a "brown belt or the black belt." Mrs. Larkins would use both belts to spank J.T., while Mr. Larkins would "sometimes" use the black belt. When Mr. Larkins and Mrs. Larkins used the belts to spank J.T., it would leave bruises on J.T.'s bottom, back, and legs.
[¶5] Occasionally, Mrs. Larkins would wet the belt with water before hitting J.T. with it. Mrs. Larkins would also wrap the belt around J.T.'s neck and lift him off the ground by the belt. Mrs. Larkins would tighten the belt around J.T.'s neck so that he could not breathe or talk, leaving red marks on J.T.'s neck. At other times, both Mr. Larkins and Mrs. Larkins would hit J.T. with a wooden backscratcher as punishment. As with the belts, the backscratcher would cause "dark bruises" on J.T.'s bottom and legs. In addition to the beatings, both Mr. Larkins and Mrs. Larkins would tell J.T. that they "didn't want to see his face again, that he was worthless, and that he wasn't part of the family."
[¶6] In late April 2015, M.D.T. showed her school psychologist some pictures of bruises on J.T.'s bottom that Mrs. Larkins had inflicted with a belt the day before, at the 10th Street address. The psychologist reported the abuse to authorities.
[¶7] Jennifer Stowers, J.T.'s counselor, began seeing him in September 2015 after he was removed from the Larkins' home. As part of her examination, Ms. Stowers was "made aware that there was some past trauma in his history," which included "physical abuse." J.T. talked with her about "getting hit with a belt ... [and] being yelled at." Ms. Stowers diagnosed J.T. with post-traumatic stress disorder (PTSD), based on J.T.'s "hypervigilance," "hyperalertness," and "dissociation." This caused J.T. to have "tantrums" where "he would go into his room [at the foster home] and ... start yelling out things, like he wasn't feeling like he was loved and stuff like that." The PTSD also caused J.T. to have a "diminished interest in participation in significant activities." During their sessions, J.T. would "emotionally almost shut down" when Ms. Stowers would try to discuss the abuse. During one session, J.T. became upset because a mask he saw in the office's playroom looked like Mr. Larkins. Ms. Stowers testified that, notwithstanding J.T.'s PTSD, he generally "functions normally," but that he was "emotionally ... very flat," and "not very good at expressing his emotions."
B. The Mental Injuries to M.D.T.
[¶8] M.D.T. testified about witnessing Mr. Larkins and Mrs. Larkins physically abuse her younger siblings and Jesus. Most of the beatings M.D.T. witnessed occurred at the 10th Street address. She recalled how they would beat J.T. on "almost ... a daily basis." She watched Mrs. Larkins use a wet belt to whip J.T., and saw her use a belt to choke J.T. She witnessed both Mr. Larkins and Mrs. Larkins beat J.T. with the wooden backscratcher. M.D.T. saw the bruises and welts these beatings left on J.T.'s bottom and lower back. She remembered one occasion when she watched Mr. Larkins beat J.T. with the backscratcher as J.T. screamed for help. She characterized these episodes as "very traumatizing." On one occasion, at the Merritt Road house, M.D.T. tried to intervene while Mrs. Larkins was choking J.T. with the belt, but Mrs. Larkins pushed M.D.T. into a wall.
[¶9] At the West Winds address, M.D.T. also watched the Larkins spank her younger sister, M.M.T., and later saw the bruises the beatings left on M.M.T. She also saw Mr. Larkins, at the West Winds address, whip J.K. with a belt while he called for help, leaving marks and bruises on J.K.'s back and behind his ear.
[¶10] M.D.T. testified that once Mrs. Larkins choked her with her hand. Both Mr. and Mrs. Larkins would also call her "stupid" and "fat." These verbal attacks made her feel "lonely," "worthless," and "alone" to the *35 point that she wanted to die. M.D.T. lived with these feelings every day. Sometimes she would cope by cutting herself or making herself throw up. Despite the abuse she witnessed, M.D.T. was reluctant to tell anyone for fear of losing the only family she had known.
[¶11] After M.D.T. was removed from the Larkins' home, she lived at the Cathedral Home in Laramie. Stacey Scholl, the therapist at Cathedral Home, diagnosed M.D.T. with PTSD, depression, anxiety, and substance abuse. Ms. Scholl relied on the reports of the abuse M.D.T. witnessed to diagnose her with PTSD. Because of her mental illnesses, M.D.T. had a difficult time "processing her emotions[,] ... connecting with others, ... [and] function[ing] at times within her [social environment]."
C. The Abuse of Jesus Manzanares
[¶12] Jesus was born with spina bifida and hydrocephalus. He has a hole in his spine and water on his brain. When he was younger, he had to have his right foot amputated. He has a shunt from his brain to his stomach and uses a wheelchair to get around. He also suffers from anxiety and attention deficit hyperactivity disorder (ADHD).
[¶13] In approximately 2011, when he was 17 years old, Jesus went to live with the Larkins in Cheyenne. Because of his disabilities, when Jesus would have particularly bad bowel movements, he would need help cleaning up, but did not ask Mr. Larkins or Mrs. Larkins for help because he "already knew what [the] answer was going to be." Jesus' grandmother testified that Jesus "has a hard time ... doing things for himself."
[¶14] M.D.T. testified that she would help Jesus clean himself. The Larkins, however, refused to help Jesus clean himself. Instead, they would get "extremely angry" at Jesus and call him "worthless" and "crippled." While in the basement at the Merritt Road house, M.D.T. saw Mrs. Larkins pull Jesus out of his wheelchair and beat him with her hands. Later that day, after Mr. Larkins returned home, he told Jesus that he was "worthless."
[¶15] On another occasion in the basement, Mrs. Larkins pushed Jesus to the ground for having a bowel movement on the couch. Jesus had another bowel movement in the garage and Mr. Larkins and Mrs. Larkins made him wash his clothes in the garage sink by hand without any gloves, while they berated him and told him that he was "sickening." Mr. Larkins also "knocked" him on his head because of his occasional incontinence.
D. The Physical Abuse of J.K.
[¶16] J.K. and his mother lived with the Larkins at the West Winds address for approximately six months in 2010 and 2011. J.K.'s mother gave Mr. Larkins permission to discipline J.K. while she was at work. Mr. Larkins obliged and would punish J.K. for not doing his chores or for being disrespectful to Mrs. Larkins. As punishment, Mr. Larkins would require J.K. to get in the "front-lean rest position," a push-up position J.K. was required to hold with his arms extended until Mr. Larkins allowed him to stop.
[¶17] In January 2011, while being punished this way, J.K. could not hold the position because of an unrelated shoulder injury. As further punishment, Mr. Larkins used a belt to whip J.K. on his back and punched him on the side of the head. The belt left bruises on J.K.'s back and Mr. Larkins' hand left a mark on the side of J.K.'s head. The next day at school, J.K. reported the abuse to the school nurse and to Deputy Michael Poteet of the Laramie County Sheriff's Office. Deputy Poteet took pictures of J.K.'s injuries. Mr. Larkins was arrested shortly after, but the Laramie County District Attorney's Office dismissed the charges for insufficient evidence. The State refiled this charge against Mr. Larkins after the other children came forward with their accounts of abuse in the home.
E. The Recordings of Mr. Larkins' and Mrs. Larkins' Interviews with Detective Johnson
[¶18] Detective Zach Johnson of the Cheyenne Police Department interviewed separately Mrs. Larkins and Mr. Larkins during his investigation of the abuse allegations.
*36 Those interviews were played, without objection, to the jury. Mr. Larkins' interview, conducted at the Cheyenne Police Department, was a video recording, while Mrs. Larkins' interview was conducted at her home and was an audio recording.[2]
[¶19] The State played Mr. Larkins' interview first. In it, Detective Johnson repeatedly asked Mr. Larkins if he thought the children were lying. Mr. Larkins said that he did. He also told Detective Johnson, "Have I thought of beating their a** until bloody? Yes, I have. ... Have I? No." When the conversation turned to the phrase "reasonable corporal punishment," Detective Johnson told Mr. Larkins that it meant "legal punishment," "physical, spanking, things like that," to which Mr. Larkins responded: "We'll beat their a**, yeah .... We'll spank their a**, we'll beat their a**, yeah." Mr. Larkins clarified, however, that he meant only with their hands.
[¶20] During the interview, Detective Johnson stated that "I don't have a dog in this fight," and that he was only "the finder of fact." He also stated that he did not "want to have to tell [the people he has to report to] ... we have this evidence, but [Mr. Larkins] and [Mrs. Larkins] said no, that never happened." At the end of the interview, when Detective Johnson discussed the backscratcher and some earlier statements Mr. Larkins had made regarding the backscratcher, Mr. Larkins stated, "We have a lawyer for that," and ended the interview.
[¶21] In both interviews, Detective Johnson discussed how all the children were forensically interviewed. He asserted that:
I'm also trained in forensic interview[s]. I didn't do these forensic interviews ... but I'm actually trained in them too. And you can tell when the kids have been coached as opposed to when they actually have contextual details [inaudible] to things that have happened, because they'll be able to say, yes, this happened but they won't be able to describe it. They won't be able to give things around it. So there's no signs of coaching or anything like that. So that's why -- they're credible statements from the children.
There's 20 some thousand research articles by psychiatrists and people like that, people way smarter than I'll ever be, that research forensic interviewing of children that actually show forensic interview of a child is more credible than a statement from you or me as an adult because of how the information is gathered.[3 ]
[¶22] In addition, during her interview, Mrs. Larkins referenced "the whole civil stuff with the DA's office" and that she had a separate attorney for that matter. Towards the middle of the interview, Mrs. Larkins also stated, "this is where I'd like my lawyer." However, she then immediately told Detective Johnson that they could keep talking, and the interview continued.
[¶23] After the State played Mr. Larkins' interview, and while it was playing Mrs. Larkins' interview, the district court, outside the presence of the jury, voiced its concerns about some of the statements contained in the interviews. The court observed that, in both interviews, Detective Johnson appeared to be vouching for the children's credibility, and that, in Mr. Larkins' interview, the jury heard him request counsel and "invoke[ ] ... his right to remain silent." Both Mr. Larkins' and Mrs. Larkins' counsel told the court that they had reviewed the recordings, identified those issues, and had decided that they would not object to playing the recordings. Mr. Larkins' counsel stated that she "thought there were a lot of good things that came out for us on that video." Similarly, Mrs. Larkins' counsel told the court that she wanted the recording played because it helped establish that Mrs. Larkins' defense-that these incidents did not happen-had been consistent from the beginning.
*37 [¶24] The district court then asked each defense counsel if they wished to have the court issue a limiting instruction about some of the objectionable material in the recordings. Neither counsel requested a limiting instruction because they did not want to draw further attention to the objectionable material.
F. The Charges
[¶25] In fall 2015, after M.D.T. had reported the abuse of J.T. in late April 2015, the State charged Mr. Larkins with one count of causing physical injury to J.K, in Docket No. 32-780. Then, in Docket No. 32-782, the State charged Mr. Larkins with two counts of physical injury to J.T., one count of mental injury to J.T., one count of physical injury to M.M.T., one count of mental injury to M.M.T., one count of mental injury to M.D.T., and one count of abuse of a vulnerable adult regarding Jesus.[4] In Docket No. 32-781, the State charged Mrs. Larkins with three counts of physical injury to J.T., one count of mental injury to J.T., one count of physical injury to M.M.T., one count of mental injury to M.M.T., one count of mental injury to M.D.T., and one count of abuse of a vulnerable adult.
[¶26] The State moved, without objection, to join all three dockets for trial. The district court granted the State's motion, all three dockets were joined, and they proceeded to trial together. Towards the close of the evidence at trial, with no objection, the State moved to amend the Information to clarify the specific acts that it alleged constituted the physical injury to J.T. The district court granted the request. Thus, the charges, as they were submitted to the jury, other than those regarding M.M.T.,[5] were:
J.T.
Mr. Larkins: two counts of physical injury caused between January 1, 2014 and December 31, 2014: with the black belt and with the backscratcher.
Mrs. Larkins: three counts of physical injury: one with the belt and one of choking him with the belt between January 1, 2014 and December 31, 2014; and one unspecified count for injuries inflicted on April 19, 2015.
Both: one count of mental injury caused between January 1, 2014 and April 30, 2015.
J.K.
Mr. Larkins: one count of physical injury caused on January 13, 2011.
M.D.T.
Both: one count of mental injury caused between January 1, 2014 and April 30, 2015.
Jesus
Both: one count of abuse of a vulnerable adult caused between January 1, 2014 and December 31, 2014.
Additional information regarding the charges and testimony relevant to these charges is discussed below.
G. Verdict and Sentence
[¶27] The jury convicted Mr. Larkins of two counts of physical abuse of J.T., one count of mental abuse of J.T., one count of mental abuse of M.D.T., one count of abuse of a vulnerable adult, and one count of physical abuse of J.K. The jury convicted Mrs. Larkins of three counts of physical abuse of J.T., one count of mental abuse of J.T., one count of mental abuse of M.D.T., and one count of abuse of a vulnerable adult. The district court sentenced Mr. Larkins to between three and five years in prison on each count. It ordered three counts to run concurrently, and ordered the remainder to also run concurrently, but suspended the remainder in favor of five years of probation to start after he served his imposed sentence. Thus, Mr. Larkins received an imposed sentence of three to five years in prison, with a consecutive term of probation for five years. The district court sentenced Mrs. Larkins to three concurrent sentences of between 18 and 36 months in prison, and three concurrent sentences of three to five years in prison.
*38 The former sentences were imposed, while the latter were suspended in favor of five years of probation.
[¶28] Both Larkins timely appealed the district court's judgments and sentences.
II. Rule 21 Proceedings
[¶29] After the initial appeals in this case were docketed, Mr. Larkins filed a motion for a new trial with the district court under Rule 21 of the Wyoming Rules of Appellate Procedure. He argued that his trial counsel was constitutionally ineffective for three reasons: (1) failing to redact portions of Detective Johnson's interviews; (2) failing to request a bill of particulars; and (3) failing to object to the joinder of Mr. Larkins' two cases, Docket Nos. 32-780 and 32-782.
[¶30] Mrs. Larkins' Rule 21 motion contended that her trial counsel was deficient for two reasons: (1) allowing the unredacted interviews to be played to the jury without objection; and (2) failing to object to the joinder of Mrs. Larkins' case with Mr. Larkins' two cases. On December 20, 2017, the district court conducted a hearing on both motions.
A. Mr. Larkins' Trial Attorney
[¶31] Mr. Larkins' attorney testified that she did not object to joinder, in part, because she believed that it was unlikely that the district court would deny the motion. Moreover, joining the case regarding J.K. with the other cases would help her create a picture that the State was "in hysteria" because it had initially dismissed the charge regarding J.K. and only decided to bring the case when the other children made reports. She also testified that she concluded that Mr. Larkins "needed" Mrs. Larkins' testimony about the family dynamics and history. She shared Mrs. Larkins' theory of defense that M.D.T. had encouraged her siblings to lie. She weighed Mr. Larkins' desire to join the cases and made a "strategic decision" to allow joinder.
[¶32] As to the interview recordings, counsel again made a strategic decision to "let it all play," and "couldn't believe our luck that they were playing it." Mr. Larkins' counsel concluded that the recording's beneficial content outweighed its objectionable material. For example, in the recording Mr. Larkins discussed his belief that the children were lying. Mr. Larkins' counsel also made a strategic decision not to request a limiting instruction from the court because it might call the jury's attention to the objectionable material. Finally, she did not attempt to redact the recordings to remove the vouching and other objectionable material because she was afraid it would cause confusion regarding Mr. Larkins' answers to particular questions.
[¶33] As to her decision not to request a bill of particulars, counsel testified that "We always knew what the counts were -- or what the allegations were. The only confusion was which allegation went with which count. ... It was very clear from the preliminary hearing on what was what." Even at the time of the Rule 21 hearing, she believed she "had everything [ ] needed to prepare for trial."
B. Mrs. Larkins' Trial Attorney
[¶34] Mrs. Larkins' trial counsel discussed her similar theory of defense that the children were lying, and that the children's biological mother had "put up" M.D.T. to make up the allegations. Counsel recalled that she, Mr. Larkins, Mrs. Larkins, and Mr. Larkins' trial counsel, all agreed to join the three pending cases for trial. She stated that, by joining the case, she was able to have witnesses, who would otherwise only pertain to Mr. Larkins (e.g., his boss and co-workers), testify about the family dynamics that she believed were beneficial to Mrs. Larkins' case. But she also considered how J.K.'s accusations, against only Mr. Larkins, might negatively impact her case. In the end, however, counsel concluded that the joinder was appropriate and, thus, did not object to the State's motion to join the cases.
[¶35] As to the recordings of the interviews, counsel testified that their introduction allowed her to introduce otherwise inadmissible evidence which she believed supported Mrs. Larkins' defense. For example, in the interviews both Mr. Larkins and Mrs. Larkins discussed their personal theories that the children were lying and that M.D.T. had concocted the whole story.
*39 Despite her knowledge of the vouching in the video, she made a "strategic decision" to allow the video into evidence.
C. The District Court's Decision
[¶36] The district court concluded that both trial counsel had "strategic reasons to join the cases for trial." The Larkins had similar theories of defense and joinder permitted them to use evidence that might otherwise have been inadmissible. The court also stated that "if the [Larkins] had objected to joinder, th[e] court would likely have overruled their objections" because Rules 8 and 13 of the Wyoming Rules of Criminal Procedure" 'favor joint trials' " (quoting Earley v. State , 2011 WY 164, ¶ 5, 267 P.3d 561, 563 (Wyo. 2011) ) when the charges are " 'of the same or similar character' " (quoting W.R.Cr.P. 8 ).
[¶37] Turning to the interview recordings, the district court held that both trial counsel "made a deliberate decision" to let the recordings play in their entirety because they believed that the recordings "helped advance their theory of defense." The court continued:
This court understands defense counsels' arguments that the recorded interviews contained information that potentially helped their clients. In both interviews, the [Larkins] asserted their innocence and denied that they had physically abused any of the children. Furthermore, by offering the statements, counsel could argue that the positions of their clients had always been consistent, from the beginning of the investigation to time of trial. The interviews further allowed the [Larkins] to advance their theory of defense that the oldest daughter, [M.D.T.], had recently been grounded (for wrecking their car), thus establishing that she had a potential motive to leave the home and to encourage her younger siblings to fabricate the allegations.
[¶38] The district court did not address whether trial counsels' strategic decisions amounted to deficient performance on the part of either counsel. Rather, it concluded that neither Mr. Larkins nor Mrs. Larkins suffered material prejudice because of their counsels' decisions to let the recordings play. The court concluded that, even without the recordings, "the State ... presented strong evidence of the [Larkins'] guilt to the jury." The court referenced the victims' "credible and detailed testimony of the abuse they suffered," the physical evidence presented, and corroboration of the victims' testimony by other witnesses.
[¶39] Finally, the district court concluded that Mr. Larkins' argument regarding his attorney's failure to request a bill of particulars could "be disposed of easily." The court cited Mr. Larkins' attorney's testimony at the Rule 21 hearing that "she was fully informed of the nature of the charges that the State filed against her client." The court found neither counsel was ineffective and denied the motions for a new trial. Mr. Larkins and Mrs. Larkins timely appealed, and this Court consolidated the appeals.
DISCUSSION
I. Whether the State Presented Sufficient Evidence
[¶40] When evaluating whether the State provided sufficient evidence to meet its burden, we " 'examine and accept as true the State's evidence and all reasonable inferences which can be drawn from it.' " Villarreal v. State , 2017 WY 81, ¶ 26, 398 P.3d 512, 520 (Wyo. 2017) (quoting Bean v. State , 2016 WY 48, ¶ 44, 373 P.3d 372, 386 (Wyo. 2016) ). "We disregard any evidence that conflicts with the State's evidence." Villarreal ¶ 26, 398 P.3d at 520 (citing Pena v. State , 2015 WY 149, ¶ 16, 361 P.3d 862, 866 (Wyo. 2015) ). After examining the State's evidence, whether direct or circumstantial, the sole inquiry is "whether a rational trier of fact could find that the essential elements of a crime were proven beyond a reasonable doubt." Flores v. State , 2017 WY 120, ¶ 12, 403 P.3d 993, 996 (Wyo. 2017) ; see also Villarreal , ¶ 26, 398 P.3d at 520.
A. Mr. Larkins' Physical Abuse of J.K. and J.T.
[¶41] Mr. Larkins contends that the evidence was insufficient to establish that he was the proximate cause of J.K.'s and J.T.'s *40 physical injuries. Under Wyo. Stat. Ann. § 6-2-503(b)(i) (LexisNexis 2017), a person responsible for a child's welfare is guilty of child abuse if they intentionally or recklessly inflict physical injury on that child. "Physical injury" is defined as:
[A]ny harm to a child including but not limited to disfigurement, impairment of any bodily organ, skin bruising if greater in magnitude than minor bruising associated with reasonable corporal punishment, bleeding, burns, fracture of any bone, subdural hematoma or substantial malnutrition ....
Wyo. Stat. Ann. § 14-3-202(a)(ii)(B) (LexisNexis 2017).
[¶42] When injury is an element of a particular crime, the State must prove that the defendant's conduct was the proximate cause of the alleged injury. See, e.g. , Grimes v. State , 2013 WY 84, ¶ 10, 304 P.3d 972, 975 (Wyo. 2013). " 'To be the 'proximate cause,' the ... injury must be the natural and probable consequence of the defendant's wrongful conduct; a 'substantial factor' in bringing about the injuries or death.' " Id. (quoting Allen v. State , 2002 WY 48, ¶ 42, 43 P.3d 551, 565-66 (Wyo. 2002) ) (alterations in original). Count I alleged that Mr. Larkins caused physical injury to J.T. "by using a black belt ...." Count II alleged that he caused physical injury "by using a backscratcher." Both counts alleged that the abuse occurred between January 1, 2014 and December 31, 2014. The jury instructions incorporated these essential elements.
[¶43] Mr. Larkins argues that the evidence was insufficient to prove that he used a black belt or backscratcher to cause physical injury to J.T. In addition, he asserts that, even if there was, there is a lack of evidence tying a particular incident to a particular injury.
[¶44] J.T. testified that Mr. Larkins would "sometimes" use the black belt as punishment if J.T. did not complete his chores. J.T. recalled that the belt would leave bruises on his bottom, back, and legs. Although J.T. said that only Mrs. Larkins would use the backscratcher, his three other siblings all recalled seeing Mr. Larkins use the backscratcher on J.T. Jesus and M.D.T. recalled seeing bruises and welts on J.T.'s bottom and legs after J.T. was hit with the backscratcher. M.D.T. remembered that the beating with the backscratcher "started" while they were living at the 10th Street house, where they lived beginning in November 2014. It is the jury's job to weigh conflicting testimony and decide who to believe. See, e.g. , Willis v. State , 2002 WY 79, ¶ 8, 46 P.3d 890, 894 (Wyo. 2002). Given the verdict rendered, it is obvious that the jury believed J.T.'s siblings regarding whether Mr. Larkins used the backscratcher on J.T. On appeal, we do not second-guess that decision. See, e.g. , Villarreal , 2017 WY 81, ¶ 26, 398 P.3d at 520.
[¶45] When J.T. and his siblings discussed the effects of the beatings with the belt and backscratcher, they discussed the injuries as occurring every time the Larkins used the belt and backscratcher to beat J.T. A reasonable person could conclude that the bruises and welts J.T. and his siblings saw on J.T.'s body were the "natural and probable consequence" of the use of a belt and a wooden backscratcher to punish J.T. Based on the testimony and evidence, a reasonable person could conclude that Mr. Larkins caused physical injury to J.T. by beating him with the belt and backscratcher.[6]
[¶46] With respect to the abuse of J.K., Mr. Larkins' briefly argues that the State had previously declined to prosecute the allegations when they arose in 2011, and that the only "witnesses ... [were] Mr. and [Mrs.] Larkins and J.K." A review of the relevant testimony establishes that there was sufficient evidence. J.K. testified that, on January 13, 2011, he was punished for being disrespectful towards Mrs. Larkins. He then recounted how his then existing shoulder injury made it difficult to hold the "position" demanded by Mr. Larkins. When he could not hold the position and fell to the floor, Mr. Larkins whipped him with a belt and *41 punched him on the side of the head. J.K. remembered the pain and the bruises on his back and head. Those injuries were documented and corroborated by two other witnesses-the school nurse and Deputy Poteet. We conclude that the State presented sufficient evidence that Mr. Larkins intentionally caused physical injury to J.K.
B. Mr. Larkins' and Mrs. Larkins' Mental Abuse of J.T. and M.D.T.
[¶47] The jury convicted Mr. Larkins of one count of child abuse causing mental injury to J.T. and one count of child abuse causing mental injury to M.D.T. It convicted Mrs. Larkins of the same. All four counts were found to have occurred between January 1, 2014 and April 30, 2015. This time frame encompassed the period when the Larkins lived at the Merritt Road and 10th Street addresses. The State had to prove that Mr. Larkins' and Mrs. Larkins' conduct was the proximate cause of J.T.'s and M.D.T.'s mental injury between January 1, 2014 and April 30, 2015. See, e.g. , Grimes , 2013 WY 84, ¶ 10, 304 P.3d at 975.
[¶48] The Larkins do not dispute that the children have mental injuries. Rather, they assert that J.T. and M.D.T. were experiencing mental illnesses before the charged abuse in this case and that those illnesses were substantially similar to those diagnosed after they were removed from the home. Thus, they argue, the evidence was insufficient to establish that their conduct caused J.T.'s and M.D.T.'s mental injuries. In support of their argument, they cite extensively to the testimony of Dr. Mary Ellen Sternitzke.
[¶49] Dr. Sternitzke, a licensed psychologist, evaluated M.D.T. in January 2014 and evaluated J.T. in June 2014, at the request of the children's therapist at the time. Dr. Sternitzke noted that M.D.T. "has a lot of difficulty inhibiting or controlling her behavior" and "emotional control problems." She diagnosed M.D.T. with depression and PTSD. Dr. Sternitzke opined that M.D.T.'s problems likely stemmed from being exposed to alcohol or drugs as a fetus, as well as having a "bad experience with a 19-year-old boy." At the time of M.D.T.'s evaluation, M.D.T. did not divulge that the Larkins were abusing her or her siblings. M.D.T. also claimed that she had been self-harming since she was twelve- or thirteen-years old (prior to the alleged mental abuse in this case).
[¶50] Dr. Sternitzke diagnosed J.T. with autism, depression, PTSD, and ADHD. Again, she tied these illnesses to likely fetal alcohol exposure. Dr. Sternitzke recognized that the diagnoses she made in 2014 were substantially similar to those made in 2015 by Ms. Stowers (for J.T.) and Ms. Scholl (for M.D.T.). She also agreed that it is difficult to say, "with any degree of certainty," what causes PTSD in a child. "Mental injury" is defined as:
[A]n injury to the psychological capacity or emotional stability of a child as evidenced by an observable or substantial impairment in [their] ability to function within a normal range of performance and behavior with due regard to [their] culture.
Wyo. Stat. Ann. § 14-3-202(a)(ii)(A) (LexisNexis 2017).
[¶51] J.T. testified extensively about the abuse Mr. Larkins and Mrs. Larkins inflicted on him. In September 2015, his counselor, Ms. Stowers, diagnosed him with PTSD. J.T. was "hyperalter[ ]" and "dissociati[ve]." He had a "diminished interest in participation in significant activities," and was "not very good at expressing his emotions." Ms. Stowers relied in part on the reported physical abuse that J.T. endured while living with the Larkins to reach her diagnosis.
[¶52] M.D.T. also testified about the abuse she witnessed Mr. Larkins and Mrs. Larkins inflict on her siblings and Jesus, which was "very traumatizing" for M.D.T. She also testified that Mr. Larkins and Mrs. Larkins called her "fat" and "stupid" and made her want to die. To cope, she resorted to self-harm. M.D.T.'s therapist, Ms. Scholl, diagnosed her with PTSD, depression, anxiety, and substance abuse, caused by the abuse she witnessed. She concluded that M.D.T.'s mental illnesses have negatively affected her ability to function within her social environment.
[¶53] Both Ms. Stowers and Ms. Scholl attributed J.T.'s and M.D.T.'s mental illnesses, in part, to the abuse they suffered and *42 witnessed. They also discussed how those mental illnesses have affected J.T.'s and M.D.T.'s ability to function "within a normal range of performance." We have previously recognized that experiencing and witnessing domestic violence is sufficient to establish the mental injury element of child abuse. See In re KLS , 2004 WY 87, ¶ 18, 94 P.3d 1025, 1029 (Wyo. 2004). "A young child is not a mere bystander to domestic violence. The consequences of subjecting [a child] to such dysfunctional behavior are manifested in [their] documented psychological problems." Id. , ¶ 23, 94 P.3d at 1031 (footnote omitted).[7] In KLS , the child's social worker diagnosed her with PTSD because of her exposure to domestic violence in the home. Id. at ¶ 20, 94 P.3d at 1030. See also In re ZKP , 979 P.2d 953, 958 (Wyo. 1999) (relying on the child's self-harm to support a finding of mental injury caused by child abuse).
[¶54] We find the Larkins' arguments unpersuasive. Even assuming Dr. Sternitzke's testimony wholly supported their argument that the children had preexisting conditions unconnected to the Larkins' conduct, that is not a basis to conclude that the State presented insufficient evidence. On appeal, we disregard the evidence favorable to the appellant and construe the evidence and all favorable inferences in favor of the State. Villarreal , 2017 WY 81, ¶ 26, 398 P.3d at 520. The testimony and evidence presented was sufficient for a reasonable person to conclude that J.T.'s and M.D.T.'s mental injuries were caused by the Larkins' conduct.
[¶55] The general purpose of the child abuse statutes is "to protect the most helpless members of our society ...." See Foltz v. State , 2017 WY 155, ¶ 20, 407 P.3d 398, 403 (Wyo. 2017). We reject the notion implicit in the Larkins' argument that, because the children had suffered mental injury before they came into the Larkins' home, additional abuse could not cause further demonstrable damage. If the mental illnesses that Dr. Sternitzke identified did preexist the Larkins' abuse, that does not preclude a reasonable person from concluding that their conduct, standing alone, caused or "exacerbated" J.T.'s and M.D.T.'s conditions. See, e.g. , Gifford v. State , 2017 WY 93, ¶ 36, 399 P.3d 1240, 1248 (Wyo. 2017) ("Mr. Tibbets has presented no argument or authority indicating that the abuse contemplated by Wyo. Stat. Ann. § 6-2-503(b)(ii) must occur contemporaneously with a single reckless act."); V.S.B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs. , 45 P.3d 1198, 1204 (Alaska 2002).[8]
Psychological abuse is the sustained, repetitive, inappropriate behavior which damages or substantially reduces the creative and developmental potential of crucially important mental faculties and mental processes of a child; these faculties and processes include intelligence, memory, recognition, perception, attention, imagination, and moral development.
Sana Loue, Legal and Epidemiological Aspects of Child Maltreatment , 19 J. Legal Med. 471, 483 (1998) (citation omitted) (emphasis added).
[¶56] It was reasonable for the jury to conclude that the State presented sufficient evidence that J.T. and M.D.T. suffered from mental injury that was the natural and probable consequence of the Larkins' conduct.
C. Whether Jesus Manzanares Was a Vulnerable Adult
[¶57] Both Larkins were convicted of abuse of a vulnerable adult for their treatment of Jesus, in violation of Wyo. Stat. Ann. § 6-2-507(c) (LexisNexis 2017). "Vulnerable adult" "means any person eighteen (18) years of age or older who is unable to manage and take care of himself or his money, assets or *43 property without assistance as a result of advanced age or physical or mental disability [.]" Wyo. Stat. Ann. § 35-20-102 (a)(xviii) (LexisNexis 2017) (emphasis added). The Larkins contend that Jesus did not fit the definition of vulnerable adult; specifically, they argue that the evidence was insufficient to establish that he was unable to take care of himself. They argue that, because Jesus could do many things without assistance while in their care, he did not meet the definition of "vulnerable adult."
[¶58] The Larkins rely heavily on the use of the term "unable" in the definition. While it is true that Jesus testified that he could do most things without assistance, or would forgo assistance from the Larkins because he "already knew what [the] answer was going to be," both Jesus and M.D.T. testified that he needed help cleaning himself on occasion. Jesus' grandmother testified that he had "a hard time ... doing things for himself" because of his physical disabilities. Mrs. Larkins testified that Jesus relied on others to get to his doctor appointments because he could not drive.
[¶59] In Blevins v. State , the defendant argued that the evidence was insufficient to establish that the victim was unable to care for himself without assistance. 2017 WY 43, ¶ 11, 393 P.3d 1249, 1252 (Wyo. 2017). There, the victim relied on others to do chores around his house because his caregivers were afraid that his "physical ailments" would cause him to fall." Id. at ¶ 11, 393 P.3d at 1252-53. The defendant, however, relied on testimony that the victim "lived alone and drove himself to some appointments at the VA and to get groceries" to show that the victim did not qualify as a "vulnerable adult." Id. at ¶ 14, 393 P.3d at 1253. This Court rejected that argument: "[T]he evidence showed that, although he had some degree of independence, [the victim] struggled with a number of issues and needed regular help both with physical tasks and cognitive matters." Id. at ¶ 15, 393 P.3d at 1253.
[¶60] Like in Blevins , we conclude that the evidence, when viewed in the light most favorable to the State, established that Jesus, because of his physical disabilities, was unable to care for himself without assistance. While the evidence showed that Jesus could do some things without assistance, it also showed that he needed assistance to carry out some basic life activities such as cleaning himself and getting to doctor appointments. This evidence is sufficient to establish that Jesus was a vulnerable adult and, thus, sustain the Larkins' conviction for abuse of a vulnerable adult.
II. Whether the District Court Erred When It Denied Defendants' Rule 21 Motion for New Trial
A. Standard of Review
[¶61] Appeal of a district court's ruling on a Rule 21 motion involves " 'mixed questions of law and fact.' " See, e.g. , Worley v. State , 2017 WY 3, ¶ 9, 386 P.3d 765, 769 (Wyo. 2017) (quoting Griggs v. State , 2016 WY 16, ¶ 37, 367 P.3d 1108, 1124 (Wyo. 2016) ). This Court defers to a district court's factual findings unless the appellant establishes that they are clearly erroneous. Id. However, we review the district court's legal conclusion on whether trial counsel was constitutionally ineffective de novo. Id.
B. Discussion
[¶62] To prevail on the claim that they are entitled to a new trial based on ineffective assistance of trial counsel, the Larkins must establish that: (1) trial counsel rendered constitutionally deficient performance; and (2) because of that deficiency, a reasonable probability exists that the defendant would have enjoyed a more favorable verdict. Strickland v. Washington , 466 U.S. 668, 687, 695, 104 S.Ct. 2052, 2064, 2068, 80 L.Ed.2d 674 (1984). To show that trial counsel's performance was constitutionally inadequate, the defendant must demonstrate that the attorney's performance was substantially below that of a reasonably competent attorney. Bruckner v. State , 2018 WY 51, ¶ 15, 417 P.3d 178, 181-82 (Wyo. 2018). We "evaluate[ ] counsel under the circumstances existing at the time of the challenged act or omission and from the perspective available at the time of the challenged act or omission." Id. at ¶ 15, 417 P.3d at 181. Because a defendant must establish both prongs, a court can decide *44 an ineffective assistance claim on the prejudice prong without considering the deficient performance prong. Strickland , 466 U.S. at 697, 104 S.Ct. at 2069.
1. Joinder
[¶63] Before trial, the State moved to join all three cases-Mr. Larkins' two dockets and Mrs. Larkins' one docket-for trial. Neither counsel objected. Now, both raise substantially similar claims regarding whether their respective trial counsel was constitutionally deficient for not objecting to the State's motion to join the cases. Mr. Larkins argues that his attorney should have objected to the joinder of his two cases, and also the joinder of those cases with Mrs. Larkins' case.[9] Mrs. Larkins asserts that her attorney should have objected to the joinder of her one case with Mr. Larkins' two cases.
[¶64] Rules 8 and 13 of the Wyoming Rules of Criminal Procedure"favor[ ] joint trials." Earley v. State , 2011 WY 164, ¶¶ 4, 5, 267 P.3d at 563 (citing Linn v. State , 505 P.2d 1270, 1274 (Wyo. 1973) ). We have previously stated that joint trials, where appropriate, "are the rule, rather than the exception." Id. at ¶ 5, 267 P.3d at 563. Cases are not good candidates for joinder when the evidence applicable to each defendant or charge is so distinct that a "jury could not be expected to compartmentalize the evidence as it relates to separate defendants [or charges]." Id. at ¶ 6, 267 P.3d at 563.
[¶65] At the Rule 21 hearing, trial counsel for both Larkins explained why they preferred a joint trial. Both testified that they considered the pro and cons of joinder, and believed, for strategic reasons, that joinder was the better option. For example, Mrs. Larkins' trial counsel testified that, by having Mr. Larkins' cases joined with her case, she could use the testimony of witnesses pertinent to only Mr. Larkins to paint a picture of the family dynamics that she believed was beneficial to Mrs. Larkins. Similarly, Mr. Larkins' trial counsel testified that having the case regarding J.K. joined with his other case would help her create a picture that the State was "in hysteria" because it had initially dismissed the charge regarding J.K. and only decided to bring the case when the other children made reports of abuse. In addition, she testified that Mr. Larkins "needed" Mrs. Larkins' testimony about the family dynamics and history, since four of the five victims were the biological children of Mrs. Larkins' sister.
[¶66] The district court relied on this testimony to conclude that both trial counsel made a valid strategic decision to not object to joinder. The court also held that, "[e]ven if [the Larkins] had objected to joinder, [it] would likely have overruled their objections." The court held that the accusations against both Mr. Larkins and Mrs. Larkins were "of the same or similar character" (citing W.R.Cr.P. 8 ).
[¶67] This is not a case where counsel simply used the magic words "strategic decision" in describing their choices. Rather, both trial counsel discussed how they considered the pros and cons of joinder before they decided not to object. When trial counsel makes a "strategic decision" in a case, that decision is "virtually unchallengeable." Strickland , 466 U.S. at 690-91, 104 S.Ct. at 2066. An unfavorable verdict does not equate to ineffective assistance of counsel. See Woods v. State , 2017 WY 111, ¶ 15, 401 P.3d 962, 969 (Wyo. 2017).
[¶68] This Court agrees with the district court that, because the charges relating to Jesus, M.D.T., J.T., and M.M.T. involved the same victims, the same witnesses, and the same general accusations, they were well-suited for joinder. See, e.g. , *45 Hernandez v. State , 2001 WY 70, ¶¶ 7-8, 28 P.3d 17, 19-20 (Wyo. 2001). Mr. Larkins and Mrs. Larkins employed different methods of injuring J.T., but the jury instructions properly informed the jury of those distinctions. More importantly, the distinctions were not so complex that a jury could not be expected to understand and appropriately "compartmentalize" the evidence as it pertained to each defendant. See Hernandez , ¶ 8, 28 P.3d at 20.
[¶69] In support of his argument, Mr. Larkins cites to J.K.'s mother's testimony that Mrs. Larkins had "family in the Mexican biker gang." He contends that "[t]his type of testimony would not have been admissible against Mr. Larkins ...." We agree that this testimony regarding either Mr. Larkins or Mrs. Larkins was inadmissible. Indeed, when this occurred, the district court sustained an objection from Mr. Larkins' counsel and ordered that the jury not consider it. Nevertheless, in the context of Mr. Larkins' ineffective assistance claim, to establish that counsel was ineffective, a defendant must demonstrate deficient performance at the time it was rendered. See, e.g. , Gist v. State , 737 P.2d 336, 342 (Wyo. 1987) ("We do not evaluate those actions from a perspective of hindsight."). Mr. Larkins' counsel decided, before trial, not to object to joinder for the reasons discussed above. See supra ¶31. At that time, counsel had no indication that this type of objectionable evidence might arise in a trial that was months away. Thus, the fact that it happened is not a basis to conclude that counsel was ineffective in not objecting to joinder beforehand.
[¶70] Finally, counsel was not ineffective in agreeing to the joinder of Mr. Larkins' case regarding J.K. with his other case and with Mrs. Larkins' case. The Larkins argue that J.K.'s case was completely different from the other cases. While J.K.'s case only involved him and only involved the abuse inflicted by Mr. Larkins, that, standing alone, is not sufficient to defeat joinder. The allegation regarding Mr. Larkins' abuse of J.K. was not so complex that the jury could not be expected to compartmentalize that evidence and appropriately consider it only against Mr. Larkins, and not be influenced by the other counts against Mr. Larkins and Mrs. Larkins regarding the other children. See, e.g. , Dobbins v. State , 483 P.2d 255, 259 (Wyo. 1971). All three cases were about the abuse of multiple children in the Larkins' care. The fact that one of the cases involved the abuse of one victim and one of the two defendants is not sufficient to defeat joinder.
[¶71] The district court did not err when it denied the Larkins' Rule 21 motions based on their attorneys' decision not to object to joinder.
2. The Interview Recordings
[¶72] The Larkins argue that their attorneys should have redacted certain objectionable material from their interview recordings with Detective Johnson. While they both focus their arguments on Detective Johnson's vouching for the children, they also cite to the reference for counsel in the video, and reference to their separate juvenile case. Mr. Larkins also argues that Detective Johnson's attempt to define "reasonable corporal punishment" was improper and should have been redacted. We address each argument below.
a. Vouching
[¶73] The district court did not consider whether trial counsel rendered deficient performance in permitting the jury to view the portions of the recordings in which Detective Johnson vouches for the victims' credibility. Rather, it addressed this argument only under the prejudice prong. We will do the same.
[¶74] We recently addressed a similar issue in Hathaway v. State , 2017 WY 92, 399 P.3d 625 (Wyo. 2017). In Hathaway , the detective interviewed the defendant before trial and "repeatedly stated that he believed [the victim] and did not believe Mr. Hathaway," and that "the evidence showed that the sexual abuse had occurred." Id. at ¶ 6, 399 P.3d at 628. At trial, the State played the full recording for the jury. Id. at ¶ 10, 399 P.3d at 629. On appeal, this Court considered whether playing the interview amounted to plain error. Id. at ¶¶ 28-29, 399 P.3d at 634. The State conceded that the video violated "this 'Court's long-standing rules prohibiting a witness to express opinions about the accused's mendacity and guilt and about the alleged victim's truthfulness and credibility *46 ....' " Id. at ¶¶ 31-32, 399 P.3d at 634 (quoting Sweet v. State , 2010 WY 87, ¶ 28, 234 P.3d 1193, 1204-05 (Wyo. 2010) ). Thus, we limited our review to whether Mr. Hathaway had established material prejudice. Id. at ¶¶ 33-41, 399 P.3d at 634-36.
[¶75] We determined that, even without the vouching in the recording, "[t]he evidence ... was overwhelming." Id. at ¶ 35, 399 P.3d at 635. Unlike in Sweet , whose outcome depended on whether the jury believed the victim (who the Detective vouched for) or the defendant, the evidence against Mr. Hathaway included not only the compelling, consistent testimony of the victim, but also other witnesses who corroborated the victim. Id. at ¶¶ 35-36, 399 P.3d at 635. Also unlike Sweet , the prosecutor in Hathaway did not rely on the impermissible vouching in closing arguments. Id. at ¶ 38, 399 P.3d at 636. Finally, the court instructed the jury in Hathaway that it was the "final arbiter of witness credibility." Id. at ¶ 41, 399 P.3d at 636. We concluded that Mr. Hathaway had failed to show a reasonable possibility that the result would have been different.[10] Id.
[¶76] The district court in this case relied heavily on our decision in Hathaway . The court concluded:
The court finds that the State in this case presented strong evidence of the [Larkins'] guilt to the jury. Each victim presented credible and detailed testimony of the abuse they suffered. Both [J.T.] and [M.M.T.] identified the belts and backscratcher that were used to inflict the excessive punishments. A search of the [Larkins'] residence resulted in the seizure of the belts and backscratcher which were introduced by the State as evidence. The State also introduced photographs that confirmed the bruising and injuries suffered by [J.T.] in the April 2015 incident, as well as photographs of the bruising and injuries inflicted by [Mr.] Larkins on [J.K.] in 2011.
Moreover, the State did not "rely upon Detective Johnson's vouching comments in either its opening or closing arguments to the jury."
[¶77] After reviewing the entire record, we agree with the district court's conclusion. This was not a case, like Sweet , that came down to a credibility determination between the victim and the defendant. Rather, several victims gave credible and detailed testimony about what happened, and numerous witnesses who lived with the Larkins at different times corroborated the abuse. This case also had physical evidence: the devices of abuse, and pictures of J.T.'s and J.K.'s injuries. The children's therapists testified about the mental injuries the children have suffered because of the chronic abuse the Larkins inflicted. The prosecutor did not rely on the vouching in opening or closing, and the recordings did not go back to the jury room during deliberations. And, finally, the district court instructed the jury at least twice that it was the sole decider of a witness's credibility. There is not a reasonable probability that the result would have been different had the vouching been redacted.
[¶78] It is true that, unlike in Hathaway , neither trial counsel nor the State asked Detective Johnson to explain on the stand about whether his vouching was an interview technique. See Hathaway , 2017 WY 92, ¶ 37, 399 P.3d at 635-36. We held in Hathaway that this explanation served as an "important distinction" that differentiated Hathaway from Sweet and Mersereau v. State , 2012 WY 125, 286 P.3d 97 (Wyo. 2012), where we reversed. Hathaway , ¶ 37, 399 P.3d at 635. We concluded in Hathaway that "[t]hose explanations helped ameliorate the prejudicial effect of the improper vouching evidence." Id. at ¶ 37, 399 P.3d at 635-36. But, although we found this explanation helped "ameliorate" any prejudice in Hathaway , it was only one of several factors. See id. Here, unlike Hathaway , the State had physical evidence to support the victims' testimony. The lack of an "interview technique" explanation in this case does not defeat our conclusion that allowing Detective Johnson's vouching was not sufficiently prejudicial to warrant reversal.
*47 We cannot conclude that the district court erred when it denied the Larkins' Rule 21 motions.
b. Request for Counsel or Reference to the Separate Juvenile Case
[¶79] In both recordings, the Larkins either referred to counsel or referred to their separate juvenile case. However, on appeal, only Mrs. Larkins cites to this in her brief as an additional reason why trial counsel was deficient in not redacting this portion of the recording.[11]
[¶80] The general rule is that it is impermissible for the State to call attention to an accused's silence as evidence of guilt. See, e.g. , Lancaster v. State , 2002 WY 45, ¶ 35, 43 P.3d 80, 95 (Wyo. 2002) ; Tortolito v. State , 901 P.2d 387, 390 (Wyo. 1995) (holding that, under the Wyoming Constitution, the right to remain silent applies "pre-arrest and pre-Miranda "). "A 'reference' to silence is a 'comment' upon the exercise of the right to silence when it is used to the state's advantage either as substantive evidence of guilt or to suggest to the jury that the silence was an admission of guilt." Lancaster , ¶ 35, 43 P.3d at 95 (citation and some quotation marks omitted).
[¶81] In her interview, Mrs. Larkins stated: "I think at this point that is where I'd like my lawyer." Right after that, however, she told Detective Johnson "we can keep talking." Her attorney's decision not to object to this portion was not sufficiently prejudicial to warrant a finding of ineffective assistance. In addition to the strength of the State's case, the prosecutor did not comment on or seek to use her reference to counsel as evidence of guilt. See generally Lancaster , 2002 WY 45, ¶ 39, 43 P.3d at 96.[12]
c. Detective Johnson's Definition of "reasonable corporal punishment"
[¶82] Finally, Mr. Larkins argues that his attorney should have redacted the portions where Detective Johnson attempts to define "reasonable corporal punishment" as "spanking, things like that ... legal punishment." However, other than citing to the excerpts from the recordings, Mr. Larkins does not provide any cogent argument or citation to pertinent authority that this was improper or that it led to his conviction. Consequently, we will not consider it further. See, e.g. , Buszkiewic v. State , 2018 WY 100, ¶ 12 n.1, 424 P.3d 1272, 1276 n.1 (Wyo. 2018).
3. Failure to Request a Bill of Particulars
[¶83] The Larkins contend that their counsel was constitutionally deficient because they did not request a bill of particulars before trial.[13] The purpose of a bill of particulars is "to make the allegations more specific." See Volpi v. State , 2018 WY 66, ¶ 54, 419 P.3d 884, 899 (Wyo. 2018) (citation omitted). Generally, a request for a bill occurs when counsel is "confused about the State's theory of the case ...." See Young v. State , 2005 WY 136, ¶ 16, 121 P.3d 145, 149 (Wyo. 2005).
[¶84] At the Rule 21 hearing, counsel for Mr. Larkins unequivocally stated that, even without a bill of particulars, they always knew what the allegations were and how they related to each count. Because Mrs. Larkins' appellate counsel did not include any argument regarding the lack of a bill of particulars *48 in her Rule 21 motion, there is no testimony from her trial counsel about her thoughts on the need, or lack thereof, for a bill of particulars. In any event, at the close of the evidence, the district court permitted the State, with defense counsels' agreement, to amend the information to include more specific allegations as it related to the two charges against Mr. Larkins regarding physical injury to J.T., and to two of the three charges against Mrs. Larkins as it related to physical injury to J.T. The Larkins have not argued that the district court's decision to allow the amendment of the Information was erroneous or that their counsel was ineffective for not objecting to the amendment. See W.R.Cr.P. 3(e) ; see also Mowery v. State , 2011 WY 38, ¶ 9, 247 P.3d 866, 869 (Wyo. 2011) ("We have stated that 'by its very terms [ W.R.Cr.P. 3(e) ] vests the district court with wide discretion in granting or denying a motion to amend an information.' ") (quoting Temen v. State , 2009 WY 25, ¶ 11, 201 P.3d 1139, 1142 (Wyo. 2009) ).
[¶85] In addition, the Larkins have not identified how a bill of particulars would have affected their trial preparation or performance. For example, they do not argue that they would have called a different or additional witness or questioned a witness in a different manner if only they had received a bill of particulars, and they do not explain what they would have hoped to gain from a bill of particulars. A review of the charging documents, after the State amended the physical injury counts regarding J.T., establishes that the Larkins were on adequate notice as to what charges they were required to defend against. We cannot conclude that counsels' decision not to request a bill of particulars was constitutionally deficient performance.
4. Mrs. Larkins' Trial Counsel Decision Not to Request an Instruction that Defined "mental disability"
[¶86] Mrs. Larkins contends that her counsel should have requested an instruction that defined "mental disability" as it related to the abuse of a vulnerable adult count.[14] A person is deemed a "vulnerable adult" if his inability to manage his affairs without assistance is caused by either a physical or mental disability. Wyo. Stat. Ann. § 35-20-102(a)(xviii). Mrs. Larkins contends on appeal that the following argument in the State's closing made it necessary for counsel to request an instruction that defined mental disability :
And the question is: Is Jesus Manzanares a vulnerable adult? ....
... Think about this. Jesus said, when the incidents were happening, I guess all I could do was cry. That was my way of being mad. He also told you that severe anxiety causes him to black out .
(Emphasis added.) Mrs. Larkins argues that the reference to Jesus' "severe anxiety" made his mental disabilities an issue as it pertained to his status as a vulnerable adult.
[¶87] However, Mrs. Larkins has never disputed that Jesus was disabled. She admits in her brief that: "It is inarguable, Mr. Manzanares has a disability and is handicapped[,]" a reasonable position considering his multiple physical and mental diagnoses. A review of the record establishes that Mrs. Larkins' trial counsel's focus, as it pertained to Jesus' status as a vulnerable adult, was on whether he was unable to attend to his affairs without assistance, not whether he was disabled because of a mental or physical disability. Thus, we cannot conclude that the failure to request an instruction that defined mental disability was deficient performance or sufficiently prejudiced Mrs. Larkins.[15]
III. Whether the Prosecutor Committed Misconduct
[¶88] The Larkins contend that the prosecutor committed misconduct in both her initial closing and in her rebuttal closing. In her *49 initial closing, the prosecutor made the following argument:
These children have come together after a year to tell you their story. These children don't talk to anybody about their story, but they talked to you. They feel it is important that you know, because nobody else can change it. No one else can do anything about it. The counselors can't do anything about it.
So it is important. It is important to tell you. And they did. Please, listen to them .
(Emphasis added.)
[¶89] In her rebuttal closing, the prosecutor continued:
[M.D.T.] was taken out of Emily's home after she told the truth about the abuse. And she's gained nothing by it. And if her fear of being taken out of Emily's home was so strong, why would she then finally break and tell somebody what was going on?
We already know the children were reluctant to tell anyone. We already know why the children were reluctant to tell anyone. And isn't it ironic that with every point from the defense, every single point that's made from the defense, the traumatic experiences that they were brave enough to share with you and open enough to talk about with you become more and more cheapened and degraded .
Not one of these children that you heard from were charged with causing injury to Dennis or to Emily Larkins. Emily Larkins is not a victim. Emily Larkins is not a martyr. Those children, they're the victims. So I'm speaking for them .
(Emphasis added.)
[¶90] The Larkins argue that the prosecutor vouched for M.D.T. when she said that M.D.T. told the truth. The State concedes this was improper, but argues that neither Mr. Larkins nor Mrs. Larkins suffered material prejudice.
[¶91] As to the remainder of the prosecutor's closing argument, the Larkins contend that the prosecutor's goal was to appeal to the jury's "passions and prejudices." In response, the State asserts that "the prosecutor's arguments were proper rebuttals to the theories developed by defense throughout the trial and in argument."
A. Standard of Review
[¶92] Because the Larkins did not object to any of the prosecutor's closing argument, we review the alleged misconduct for plain error. See, e.g. , Osterling v. State , 2018 WY 95, ¶ 7, 424 P.3d 250, 252 (Wyo. 2018). To establish plain error, the appellant must show: (1) that the record clearly reflects the error; (2) that the error transgressed a clear and unequivocal rule of law; and (3) that the defendant suffered material prejudice that affected a substantial right. See id. (citing Watts v. State , 2016 WY 40, ¶ 6, 370 P.3d 104, 106 (Wyo. 2016) ).
[¶93] As to the third element-material prejudice to the defendant-our cases have been inconsistent. Over the years, we have vacillated between asking whether the alleged error resulted in a "reasonable possibility" the result would have been different, or a "reasonable probability." Compare, e.g. , Schmuck v. State , 2017 WY 140, ¶ 32, 406 P.3d 286, 297 (Wyo. 2017) (applying "reasonable possibility" to jury instruction issue), with, e.g. , Wiese v. State , 2016 WY 72, ¶ 32, 375 P.3d 805, 811 (Wyo. 2016) (applying "reasonable probability" to prosecutorial misconduct issue). A review of our cases, however, shows that there is no qualitative difference in our application, regardless of the word used. Plain error review is controlled by Rule 9.05 of the Rules of Appellate Procedure. W.R.A.P. 9.05. That rule does not allow a different type of plain error analysis depending on the type of issue we are reviewing. Plain error review is the same regardless of whether the issue involved jury instructions, evidence, or prosecutorial misconduct.
[¶94] While "reasonable possibility" and "reasonable probability" appear to connote different standards, in the context of appellate review, that difference is illusory. See generally Strickler v. Greene , 527 U.S. 263, 300, 119 S.Ct. 1936, 1957, 144 L.Ed.2d 286 (1999) (Souter and Kennedy, JJ., concurring in part and dissenting in part) ("[W]hile 'reasonable possibility' or 'reasonable likelihood'
*50 ... and 'reasonable probability' express distinct levels of confidence concerning the hypothetical effects of errors on decisionmakers' reasoning, the differences among the standards are slight.").[16] On appellate review, it is difficult to discern a practical distinction between the two words. Rather, the concern is whether the alleged error undermines confidence in the outcome. See id. at 300-01, 119 S.Ct. at 1957-58 ("[G]iven the soft edges of all these phrases, the touchstone of the enquiry must remain whether the ... [error] 'undermines our confidence' that the factfinder would have reached the same result."). If it does, plain error exists. If not, the conviction will stand. We conclude that, to ensure consistency going forward, the appropriate question under the prejudice prong in a plain error analysis is whether there is a reasonable probability that the result would have been more favorable to the defendant had the error not occurred. See United States v. Dominguez Benitez , 542 U.S. 74, 81, 124 S.Ct. 2333, 2339, 159 L.Ed.2d 157 (2004) (applying the "reasonable probability" standard to plain error analysis).
B. Discussion
1. Did the Prosecutor Commit Misconduct?
[¶95] When a defendant asserts that the State committed prosecutorial misconduct, we review the entire argument, and do not isolate discrete parts of the argument that may be taken out of context. See, e.g. , Buszkiewic , 2018 WY 100, ¶ 11, 424 P.3d at 1276. It is difficult for a defendant to show plain error in closing argument, " 'lest the trial court becomes required to control argument ....' " Osterling , 2018 WY 95, ¶ 10, 424 P.3d at 252-53 (quoting Carrier v. State , 2017 WY 88, ¶ 59, 400 P.3d 358, 370 (Wyo. 2017) ). In closing arguments, a prosecutor has "wide latitude" to argue the evidence in the record and all reasonable inferences which can be drawn from that evidence. See, e.g. , Lindstrom v. State , 2015 WY 28, ¶ 32, 343 P.3d 792, 800 (Wyo. 2015). There are, however, limits to that latitude. See Webb v. State , 2017 WY 108, ¶ 28, 401 P.3d 914, 925 (Wyo. 2017). We have, on numerous occasions, cited to the ABA Standards for Criminal Justice for guidance regarding what those limits are:
(a) The prosecutor may argue all reasonable inferences from evidence in the record. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.
(b) It is unprofessional conduct for the prosecutor to express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence [of] the guilt of the defendant.
(c) The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.
(d) The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.
Carrier , 2017 WY 88, ¶ 60, 400 P.3d at 370-71 (citations omitted) (alteration in original); see also Osterling , 2018 WY 95, ¶ 10, 424 P.3d at 253 ; Black v. State , 2017 WY 135, ¶ 33, 405 P.3d 1045, 1056 (Wyo. 2017).
[¶96] It is misconduct to seek a conviction by appealing to a juror's "passions and prejudices." E.g. , Wiese , 2016 WY 72, ¶ 28, 375 P.3d at 810 ; Hill v. State , 2016 WY 27, ¶ 45, 371 P.3d 553, 565 (Wyo. 2016). A prosecutor is also forbidden from personally vouching for the credibility of a witness. Hill , ¶ 53, 371 P.3d at 567 (citing Fennell v.State , 2015 WY 67, ¶ 31, 350 P.3d 710, 722 (Wyo. 2015) ). At its core, prosecutorial misconduct in closing argument is a tactic meant to encourage a conviction on an improper basis. See, e.g. , Cole v. State , 2017 WY 87, ¶ 9, 399 P.3d 618, 620 (Wyo. 2017) (citations omitted). It is argument without reference to the evidence or those reasonable inferences that can be drawn from that evidence and threatens a defendant's right to a fair trial.
*51 [¶97] In this case, the alleged misconduct clearly appears in the record. In addition, the rules governing prosecutors have been clearly laid out in numerous opinions from this Court. Thus, we must determine whether the prosecutor's argument clearly violated those rules, and, if so, whether there is a reasonable probability that the result would have been different.
[¶98] The State concedes that the prosecutor vouched for M.D.T. in closing, but disputes that any other part of the prosecutor's closing argument amounted to misconduct. The disputed statements are:
• "[The children] feel it is important that you know, because nobody else can change it. No one else can do anything about it. ... It is important to tell you. And they did. Please, listen to them."
• "[E]very single point that's made from the defense, the traumatic experiences that they were brave enough to share with you and open enough to talk about with you become more and more cheapened and degraded."
• "So I'm speaking for them."
[¶99] The Larkins argue that these statements were meant to "inflame the passions and prejudices" of the jury and to invoke sympathy for the child witnesses. "[A]n exhortation to the jury to 'do the right thing,' to 'do your job,' or to 'do you duty' is error if it implies that, in order to do so, it can only reach a certain verdict, regardless of its duty to weigh the evidence and follow the court's instruction on the law." Wilks v. State , 2002 WY 100, ¶ 28, 49 P.3d 975, 987 (Wyo. 2002) (citation, alterations, and some quotation marks omitted). In Wilks , the prosecutor made the following argument:
Read the law. Please follow the law. It's all there for you. I don't want you to twist it, I don't want you to turn it. Just read it as it is and apply the facts to the law.
There is no triumph greater that [sic] the ascertainment of the truth. That's your job. Do your duty, please, and find the Defendant guilty of First Degree Murder.
Id. We concluded that this was not misconduct:
When this statement is read in context, it is clear the prosecutor was not telling the jury that fulfillment of its duty could be achieved only through a first-degree murder conviction. Rather, the prosecutor explicitly encouraged the jury to do its duty and ascertain the truth and to apply the evidence to the given law. When the statement is reviewed in context, it is apparent there was not a transgression of a clear and unequivocal rule of law.
Id.
[¶100] In contrast, in Sam v. State , we concluded that the following argument was "severe" misconduct by the prosecutor:
You are now the voice of [the victim]. Cry out where he cannot. Tell us of his pain. Let us hear the anguish of his final desperate plea to live, to see one more sunrise, to love.
2017 WY 98, ¶ 62, 401 P.3d 834, 855 (Wyo. 2017). We found that the prosecutor's hyperbole was improper "victim impact argument." Id. at ¶ 63, 401 P.3d at 855.
[¶101] In this case, the prosecutor's argument that implored the jury to "Please listen" to the children because "No one else can do anything about it" was an argument calculated to encourage a conviction so that the children would be "protected." This is clearly improper. See Solis v. State , 2013 WY 152, ¶ 50, 315 P.3d 622, 633 (Wyo. 2013) ("After all, a jury is a fact-finding body. It is not a body assembled to cast moral judgment on a defendant."). Unlike the prosecutor in Wilks , the prosecutor here did not encourage the jury to follow the law and "ascertain[ ] the truth." Rather, the prosecutor asked the jury to help the children, and implied that the only way they could was to convict Mr. Larkins and Mrs. Larkins. This violates our clear precedent prohibiting prosecutors from seeking a conviction by appealing to the jury's passions and prejudices.
[¶102] With respect to the prosecutor's argument that the children's experiences were "becom[ing] more and more cheapened and degraded" because of the Larkins' closing argument, the State argues that the prosecutor was properly responding to the Larkins' theory of defense (i.e., that *52 the children were lying), relying on our recent decision in Hamilton v. State , 2017 WY 72, 396 P.3d 1009 (Wyo. 2017). In Hamilton , the prosecutor, in responding to the defendant's defense, made the following remarks: "They drag [the victim] through the mud"; the theory of defense is "absurd," "fundamentally ridiculous," "off-the-wall," "nonsense," and "bizarre." Id. at ¶ 13, 396 P.3d at 1013-14. On appeal, the defendant argued that this argument amounted to misconduct because it was a "personal attack against defense counsel." Id. at ¶ 14, 396 P.3d at 1014. We disagreed and held that the comments, though "ill-advised," did not transgress a clear and unequivocal rule of law. Id. at ¶ 14, 396 P.3d at 1014. We concluded that the comments were meant to directly contradict the arguments propounded by the defense and not a "personal attack" on defense counsel. Id. (citing Carroll v. State , 2015 WY 87, ¶ 41, 352 P.3d 251, 261 (Wyo. 2015) ).
[¶103] In this case, the Larkins contend that the argument that the children's experiences were being "cheapened and degraded" was meant, not as an attack on defense counsel, but to engender sympathy for the children directly. The State's attempt to apply the holding in Hamilton beyond the particular facts of that case is unavailing. It does not stand for the proposition that statements in rebuttal closing, which would otherwise be prosecutorial misconduct, are acceptable if they are in response to statements in defendant's closing. After all, the victim's credibility will often be challenged by the defendant, and such a challenge does not open the door for prosecutorial vouching or sympathy seeking. The argument that the prosecutor made may have been a response to the Larkins' closing arguments, but only served to gain sympathy for the children. This is not to say that a prosecutor cannot respond to the theories propounded by the defense. But a proper response to a defendant's theory of the case is to turn back to the evidence and those reasonable inferences that can be drawn from it that rebut that theory. Couching argument as a "response" to the defense does not give the prosecutor license to forgo our rules by retreating to argument calculated to gain sympathy for a victim. Here, the prosecutor did not argue that the defense's theory was unpersuasive because the evidence contradicted it; she argued that the defense's theory was unpersuasive because it "cheapened and degraded" the children's experiences.
[¶104] Finally, the prosecutor's argument that she was speaking for the children because no one else could was also improper. It is axiomatic that the prosecutor does not speak for the victim, but for the community. See, e.g. , Black , 2017 WY 135, ¶ 50, 405 P.3d at 1060-61 (citing Berger v. United States , 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed 1314 (1935), overruled on other grounds by Stirone v. United States , 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960) ). Again, a prosecutor's obligation in closing argument is to confine their argument to the evidence presented. This obligation is disregarded when the prosecutor resorts to first-person rhetorical devices that seek to elevate their position as a representative of the state to a personal representative for the victim.
The first person singular rhetorical device had the dual effect of placing the prosecutor in the victim's shoes and turning the prosecutor into [the victim's] personal representative. A prosecutor may no more represent the victim in this fashion than he may urge the jurors to place themselves in the victim's shoes.
Hawthorne v. United States , 476 A.2d 164, 172 (D.C. 1984). Here, the prosecutor attempted to bolster her position with the jury by placing herself, not as a representative of the State, but as a person who is appearing on behalf of the victim. This is not the prosecutor's role.
2. Did Mr. Larkins or Mrs. Larkins Suffer Material Prejudice?
[¶105] Having determined that the prosecutor committed misconduct in multiple ways when she vouched for M.D.T.'s credibility and when she sought a conviction by appealing to the jury's passions and prejudices, we must now determine whether there is a reasonable probability that the result would have been different had these errors not occurred. After reviewing the entire record, we conclude that the result would not have been different.
*53 [¶106] The evidence against the Larkins, as the district court recognized in its Rule 21 order, was strong. The State presented, over six days of trial, five victims who gave compelling testimony of the abuse they suffered. The victims' recollections were filled with discrete details of the abuse. The jury saw pictures of some of the abuse inflicted on J.K. and J.T. Moreover, other individuals who lived with the Larkins at various times corroborated the abuse. Comparing this evidence against the misconduct that occurred in closing argument, we cannot conclude that there is a reasonable probability that the result would have been different had the prosecutor not engaged in misconduct.
CONCLUSION
[¶107] For the reasons discussed above, the evidence was sufficient, the district court did not err when it denied the Larkins' Rule 21 motions, and, although some of the prosecutor's closing argument amounted to misconduct, it did not materially prejudice either Mr. Larkins or Mrs. Larkins.
[¶108] Affirmed.

In 2010, the Larkins lived at the West Winds trailer park on Williams Street in Cheyenne. Sometime in 2013 or early 2014, they moved to a house on Merritt Road. Finally, from November 2014 through April 30, 2015, they lived on 10th Street. These dates and locations are important because the children sometimes testified that specific abuse occurred at a particular address rather than by date.

It appears from the record that the State played Mr. Larkins' entire interview. However, it is unclear if the State played Mrs. Larkins' entire interview. The district court assumed for purposes of its Rule 21 order that both interviews were played in their entirety to the jury. We will do the same.

This is taken from the audio recording of Mrs. Larkins' interview. A substantially similar discussion occurred in Mr. Larkins' interview.

The circuit court dismissed some counts against both Mr. Larkins and Mrs. Larkins, which are not discussed in this opinion.

The jury did not convict the Larkins of the charges related to M.M.T. Thus, we will refer to the facts and proceedings as they relate to M.M.T. only where relevant to other charges.

Mr. Larkins does not argue that the bruises and welts J.T. and his siblings discussed were insufficient to meet the definition of "physical injury" discussed above. Rather, his argument pertains to whether the evidence was sufficient to connect a specific act to an injury.

Although KLS concerned the termination of parental rights under Title 14 of the Wyoming Statutes, the criminal code cross-references the definition of mental injury from Title 14. See Wyo. Stat. Ann. § 6-2-503(a)(ii)(B) (LexisNexis 2017). Moreover, "we have previously recognized [Title 14's] utility in determining whether a child has been criminally abused." Dunsmore v. State , 2007 WY 40, ¶ 19, 153 P.3d 275, 281 (Wyo. 2007) (citing Goldade v. State , 674 P.2d 721, 725 (Wyo. 1983) ).

The definition of "mental injury" in V.S.B. is substantially similar to the definition in Wyoming. Compare Alaska Stat. Ann. § 47.17.290(10) (LexisNexis 2018) with Wyo. Stat. Ann. § 14-3-202(a)(ii)(A) (LexisNexis 2017).

In his Rule 21 motion, Mr. Larkins did not raise any argument regarding the joinder of his cases with Mrs. Larkins' case. The first time he raised the issue was in his written closing arguments submitted to the district court after the Rule 21 hearing. In the district court's order, however, it addressed whether Mr. Larkins' counsel was ineffective for not objecting to the joinder of his cases with Mrs. Larkins' case. Generally, the failure to raise an issue in a Rule 21 motion is grounds for this Court not to consider it on appeal. See Starr v. State , 2017 WY 61, ¶ 14, 395 P.3d 180, 183-84 (Wyo. 2017). However, because the district court addressed this issue in its order, and the State does not argue that Mr. Larkins has waived this issue, we will address it as part of the parties' joinder arguments.

See infra ¶¶ 93-94, section III, A, regarding discussion of "reasonable possibility" and our plain error analysis.

In his brief, Mr. Larkins cites to his request for counsel in his recording but does not provide any argument or citation to authority as to why this fact warrants reversal as to him. Thus, we will not address it further. See, e.g. , Buszkiewic v. State , 2018 WY 100, ¶ 12 n.1, 424 P.3d 1272, 1276 n.1 (Wyo. 2018).

This is not to say that a prosecutor may elicit testimony or present evidence of the defendant's silence or request for counsel so long as they do not "comment" on it later. We have not addressed the issue of when the State introduces evidence, like a recording of an interview, that includes the "inadvertent mention of [a defendant's] request for counsel" when that "inadvertent mention" is not actively used against the defendant. See Lindgren v. Lane , 925 F.2d 198, 202 (7th Cir. 1991).

Mrs. Larkins did not raise any issue regarding a bill of particulars in her Rule 21 motion. Thus, the district court did not address this issue as it pertains to Mrs. Larkins in its order. This could be grounds to preclude this Court's review. See Starr , 2017 WY 61, ¶ 14, 395 P.3d at 183-84. However, the State does not argue that this sequence of events does, in fact, preclude our review. Thus, we will address Mrs. Larkins' bill of particulars argument along with Mr. Larkins' argument.

Mrs. Larkins did not raise this issue in her Rule 21 motion. But, the State does not contend that this precludes our review.

Similarly, within his argument that Jesus did not qualify as a "vulnerable adult," Mr. Larkins also appears to argue that the jury should have been instructed on the definition of "mental disability" as that term relates to a person's status as a "vulnerable adult." To the extent that Mr. Larkins may have provided a cogent argument on the issue, the same reasoning applies.

The issue in Strickler was a Brady violation. However, we find the discussion cited applicable to our linguistic dilemma.