2017 WY 93

**Donna Rose GIFFORD, Appellant (Defendant),**

**v.**

**The STATE of Wyoming, Appellee (Plaintiff).**

**Michael Archie Tibbets, Appellant (Defendant),**

**v.**

**The State of Wyoming, Appellee (Plaintiff).**

S-16-0240
S-16-0241

Supreme Court of Wyoming.

August 10, 2017

Representing Appellant, S-16-0240: Office of the State Public Defender: Diane M. Lozano, State Public Defender; Tina N. Olson, Chief Appellate Counsel. Argument by Ms. Olson.

Representing Appellee, S-16-0240: Peter K. Michael, Attorney General; David L. Delicath, Deputy Attorney General; Christyne M. Martens, Senior Assistant Attorney General; Philip M. Donoho, Assistant Attorney General. Argument by Mr. Donoho.

Representing Appellant, S-16-0241: Office of the State Public Defender: Diane M. Lozano, State Public Defender; Tina N. Olson, Chief Appellate Counsel; Kirk A. Morgan, Senior Assistant Appellate Counsel. Argument by Mr. Morgan.

Representing Appellee, S-16-0241: Peter K. Michael, Attorney General; David L. Delicath, Deputy Attorney General; Christyne M. Martens, Senior Assistant Attorney General; Philip M. Donoho, Assistant Attorney General; Darrell D. Jackson, Director, Kevin T. Farrelly, Student Director, and Kendra D. Winslow, Student Intern, Prosecution Assistance Program, University of Wyoming, College of Law. Argument by Ms. Winslow.

Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.

BURKE, Chief Justice.

[¶1] Appellants, Michael Archie Tibbets and Donna Rose Gifford, were each convicted after a joint trial of three counts of child abuse in violation of Wyo. Stat. Ann. § 6-2-503(b)(ii), in relation to injuries inflicted on their children. They contend the State produced insufficient evidence to support the convictions. We affirm.

## ISSUE

[¶2] Appellants present the same issue:

Did the State produce sufficient evidence to prove beyond a reasonable doubt that Appellants recklessly caused mental injury to their children?

## FACTS

[¶3] Appellants had three children together: a daughter, J.T., born in 2003, and two sons, M.T. and C.T., born in 2004 and 2007. Dr. Mary Bowers served as pediatrician for M.T. and C.T. from their birth, and for J.T. from the age of nineteen months. When M.T. was six months old, he was nearly four pounds underweight. Dr. Bowers diagnosed him with "non-organic failure to thrive"[1] and concluded that his growth had been impaired because he was not being fed enough. She advised Appellants to supplement M.T.'s feedings with baby formula. Appellants, however, "decided against" using baby formula and instead fed M.T. a mixture of whipping cream and molasses. When Dr. Bowers saw M.T. again when he was six months old, he was anemic and weighed 50% less than the average for his birth-weight.

[¶4] The same pattern repeated itself after C.T.'s birth in 2007. When Dr. Bowers saw C.T. when he was four months old, he was significantly underweight. Dr. Bowers diagnosed C.T. with non-organic failure to thrive resulting from inadequate nutrition. Although Appellants believed that C.T. was lactose intolerant, they also fed him a mixture of molasses and whipping cream. C.T. was subsequently hospitalized for a week on two separate occasions due to failure to thrive. When C.T. was five months old, he suffered a traumatic brain injury when he suffocated in loose blankets on his bed. Following this incident, C.T. had reduced vision

---

1. "Non-organic failure to thrive" means, in effect, that a child is "not getting enough calories." In contrast to "organic" failure to thrive, which results from an underlying medical condition, "non-organic" failure to thrive results from inadequate nutrition.

and required a substantially higher level of care.

[¶5] Dr. Bowers referred C.T. for rehabilitative and therapeutic services at the local Child Development Center. She made the referrals necessary for Appellants to acquire a helmet to protect C.T. when he became more mobile, but Appellants failed to obtain one. Dr. Bowers also referred C.T. to two different ophthalmologists, but Appellants failed to obtain prescription glasses for C.T. Appellants also disagreed with Dr. Bowers' conclusion that C.T. was having seizures following his brain injury.

[¶6] The Wyoming Department of Family Services ("Department") first became involved with the family in 2006 when M.T., who was two years old at the time, was discovered by law enforcement to be wandering alone outside. The Department subsequently received reports from Dr. Bowers and other care providers that M.T. and C.T. had been diagnosed with failure to thrive. The Department also received reports from the Child Development Center that Appellants were not following through with services, including speech therapy, occupational therapy, and physical therapy, provided for C.T.'s special needs. When Department personnel visited Appellants' home in 2009, they found that its condition was "out of control." There was rotting food on the floor and on the kitchen table, and there were only small pathways through clothes, boxes, and other items in the living room. There was also rotting food and trash on the floor in the children's rooms.

[¶7] Due to the fact that Appellants were not following through with Dr. Bowers' recommendations, and because of concern about the children's behaviors, she reported to the Department the possibility that the children were being neglected. Department personnel worked with the family to develop a plan to meet the children's needs. Ultimately, however, Appellants refused to accept parenting services from the Department and failed to follow through with the plan or provide a suitable home environment for the children. In 2010, the children were going to school "smelling of urine, [wearing] dirty clothes ... defecating in their pants, and then there were concerns again that the house had disintegrated again." Employees from the Child Development Center were forced to stop therapy in Appellants' home due to its condition.

[¶8] Local law enforcement subsequently reported to the Department that a friend of one of Ms. Gifford's older children requested that J.T. and M.T. "touch his penis." The friend was convicted of two counts of public indecency. In counseling, J.T. confirmed that the incident occurred and indicated that she was angry. J.T. also manifested sexualized behavior. Ms. Gifford, who was in the house at the time of the incident, characterized the incident as "a prank, in bad humor."

[¶9] In 2012, after significant efforts to treat a severe rash on C.T.'s bottom and groin, Jacqueline Coulter, C.T.'s special education teacher, contacted the Department to report the issue. Unlike other students in his class who wore diapers, C.T. had a consistent problem with diaper rash. Ms. Coulter would bathe C.T. at school and wash his clothing because he came to school in dirty and undersized clothes that "frequently smelled of feces and mold." She observed "red bumps, whiteheads throughout his private region, and up—sometimes up to his stomach" from duct tape that Appellants used to attach his diapers to his body. By putting ointment on C.T. "every hour when [school staff] took him to the bathroom throughout the week," the rash would be nearly healed by the end of the week. She explained to Ms. Gifford that duct tape should not be used, and "sent less-invasive tape home, like medical tape." Although Ms. Coulter talked to Ms. Gifford about the need to continue treatment over the weekend, C.T.'s rash would return by the next school week. By October 2012, C.T.'s rash had become so severe that

> his skin was actually peeling off of his bottom; it was red, it was cracked, and it was bleeding. Inside of the crack of his bottom was also red and cracked and bleeding.... [H]is testes and his penis [were] also red and cracked and bleeding, and on his hips was also red, cracked and bleeding.

When school staff cleaned him, he would cry out in pain.

[¶10] At that point, due to the Department's increasing concerns about C.T.'s condition, the state of Appellants' home, and Appellants' failure to follow the Department's recommendations or follow through with therapeutic services provided by the Child Development Center, law enforcement removed the children from the home and placed them in protective custody. The Department placed the children in foster care. J.T. and M.T. were placed in foster care together, and C.T. was placed separately with another family.

[¶11] In January 2013, the State filed a Neglect Petition in juvenile court alleging that J.T., M.T., and C.T. had been neglected by Appellants. The Department subsequently substantiated that J.T., M.T., and C.T. had been neglected, that C.T. had been medically neglected, and that C.T. had been abused. In 2014, Appellants voluntarily executed consents for adoption of C.T.

[¶12] Following further investigation, the State initiated the present case by separately charging Mr. Tibbets and Ms. Gifford with three counts of felony child abuse of J.T., M.T., and C.T., in violation of Wyo. Stat. Ann. § 6-2-503(b)(ii). The charging documents alleged that Appellants had intentionally or recklessly inflicted mental injury during the lifetimes of each of the children. The cases were subsequently joined, and the parties were separately represented at a joint trial held in January 2016.

[¶13] The State called numerous witnesses to testify during trial, including Dr. Bowers, Tiffany Ackels, Appellants' caseworker from the Department, Dr. Khanh Tran, the children's psychotherapist, and the children's principal, teachers, and foster parents. Dr. Bowers gave testimony relating to the social and behavioral development of the children. She stated that her concerns about the children began early in their lives, when both M.T. and C.T. presented with failure to thrive due to inadequate nutrition. She stated the children's weight loss was "very, very unusual" and that "when we have weight loss like that, we start worrying immediately about brain nutrition and possible loss of brain development, that we can never re-

gain." When Dr. Bowers saw M.T. when he was three years old, she felt that M.T. was not meeting expectations for emotional and behavioral development. Dr. Bowers noted that M.T. was "really hyper" and that he "seemed to be seeking stimulation in the office, in a very unusual fashion." She thought that his behavior was the result of sensory deprivation. When M.T. was five years old, she diagnosed him with attention deficit disorder. Dr. Bowers recommended that M.T. be evaluated at the Child Development Center. The Center found deficiencies with respect to M.T.'s fine motor skills, speech and language, and social development. Dr. Bowers testified that she "worried about the early days when [M.T.] wasn't getting well fed and if [M.T.'s] brain development had been sacrificed to that."

[¶14] Dr. Bowers also testified that she became increasingly worried about J.T.'s wellbeing over the course of her childhood. When J.T. was brought in at age seven for her first comprehensive examination in four years, Dr. Bowers discovered that J.T. was going to bed "very, very late at night" and complained about daily headaches. J.T. experienced loneliness at school and was "very needy and sensory-seeking" in Dr. Bowers' office. Dr. Bowers associated these behaviors with Appellants' interactions with J.T. at home. Dr. Bowers also diagnosed J.T. with an attention deficit disorder. Like M.T., J.T. was referred for evaluation at the Child Development Center and, like M.T., the evaluation revealed that she was deficient in the areas of fine and gross motor skills and social development. J.T. had poor hygiene and suffered from enuresis [2] and incontinence, which persisted into her adolescence. Another care provider testified that, because she did not have sheets and because Appellants failed to seek treatment for her condition, J.T. would "sleep on one side of the mattress and then the next day would move to the other side" after it had been soiled.

[¶15] Dr. Bowers also testified that she became more concerned about C.T. as he grew older. Dr. Bowers stated that she became concerned for C.T.'s physical safety

---

**2.** Enuresis is a medical term for involuntary urination, especially by children at night.

"because he had no fear response and his vision was so poor that he couldn't see where or when he was going to fall," and because Appellants did not appear willing to address the situation. She referred C.T. to two different ophthalmologists but Appellants did not make appointments with either of them. Instead, as indicated by personnel from the Child Development Center, Appellants responded to C.T.'s reduced vision by locking him in a room with a plastic mattress on the floor and by nailing blankets over the windows. C.T. would defecate and urinate in the room.

[¶16] Several witnesses gave testimony relating to the state of Appellants' home. Ms. Ackels, the Department caseworker who began assisting the family in 2006, stated that although Appellants were initially receptive to the Department's recommendations, they failed to follow through with safety plans for the children and that the condition of Appellants' home throughout the Department's involvement was "disturbing." At the time the children were removed from the home, the house was filled with garbage, rotting food, and so much clutter that there were only small walkways through the house. J.T.'s and M.T.'s room was filled with garbage and it appeared that J.T. and M.T. were sleeping on mattresses soaked with urine. A deadbolt on C.T.'s door confined him to his room, which was covered with feces, spider webs, water damage, and what appeared to be black mold. The home had a strong odor of "cat urine, feces, ammonia, garbage, and rotting food." An employee from the Child Development Center stated that "the smell was so bad that you had to learn how to breathe through your mouth, because otherwise you probably would have gotten sick."

[¶17] The State also called J.T. and M.T.'s principal, Mike Wood. He testified that he visited Appellants' home twice and observed that it "was a mess. . . . It was just—I can't even describe it." He stated that M.T. and J.T. lived in "heartbreaking filth" and that "their basic human needs were not being met," which impacted their ability to succeed at school. When they came to school, J.T. and M.T. were frequently hungry and often smelled of cat urine. The school nurses also testified that the kids were hungry, unclean, improperly dressed, and smelled of urine.

[¶18] Several witnesses testified that, after their removal from Appellants' home, the academic performance of J.T., M.T., and C.T. improved immediately and their medical conditions stabilized. Mr. Wood stated that, following the children's placement in foster care, he "was witnessing great things." He stated that the children "were immediately happy. They were happy and it was just a totally different kid immediately . . . their basic human needs are being met right now." Ms. Coulter stated that after he was placed with a foster family, C.T.'s hygiene and clothing improved noticeably and that after two semesters "he started babbling and singing . . . all day long[,]" and although he continued to wear diapers every day, C.T. no longer had a diaper rash. When he lived with Appellants, C.T. appeared to be having between six and eight seizures a day, was nonverbal, and would only rarely have outbursts that approximated speech. Ms. Coulter stated "[i]t's not typical for students who are . . . multiply disabled to make great gains in a short amount of time[,]" but that C.T. immediately started referring to himself by his name after being removed from Appellants' home. Ms. Coulter stated that C.T. made progress "right away."

[¶19] C.T.'s foster mother testified that, when he arrived at her home and saw what would be his bedroom, C.T. "just bounced and bounced [on the bed] and . . . smelled the bed and he—he was happy." He was so hungry, however, that he would attempt to eat dog food and attempted on two occasions to drink the water in a fishbowl. At first, he would eat "almost to the point of choking . . . and . . . he would eat until he would throw up." However, C.T.'s foster family was able to establish a routine for C.T., feeding him every two hours and leaving food in an accessible location.

[¶20] J.T.'s and M.T.'s foster parents also gave testimony about the children's behavior and their progress after being removed from Appellants' home. When J.T. and M.T. arrived in foster care they exhibited food-hoarding and food-seeking behaviors. At their first foster placement, J.T. and M.T.

would take whatever food they could find and stash it in their backpacks, under their pillows, or under their mattresses. They would eat until they vomited. Their foster mother would have to remind J.T. and M.T. at meals that they would be able to eat later and that "there [would] always be enough food if [they were] still hungry." Her testimony also indicated that the children lacked basic life skills. M.T. ate with his hands and feet, and did not know how to bathe himself, and neither J.T. nor M.T. knew how to brush their teeth or clean themselves after using the bathroom. After living with their foster family, however, the children learned how to clean themselves, and J.T.'s bed-wetting ceased.

[¶21] Dr. Tran gave testimony about the children's mental health based on his experience with each of them in therapy. He stated that J.T. and M.T. suffered from anxiety and both were "dysregulated emotionally as well as behaviorally." According to Dr. Tran, the children's emotional deficits manifested themselves through "impulsive behaviors, lack of boundaries, [ ] inability to attend or focus, easily distracted. They could not regulate their movements." Although J.T. and M.T. were nine and eight years old, respectively, when they began seeing Dr. Tran, they acted like "three-year-old[s]." Dr. Tran stated that the delay in J.T.'s and M.T.'s development "was so severe, it actually indicated prolonged exposure to neglect." He stated that hoarding food, in particular, is consistent with a survival technique used by children who do not receive enough food. Dr. Tran also testified that, despite their tremendous struggles, the children's progress in therapy was "phenomenal":

> In terms of progress, remarkable, considering, uhm, these children had so much potential. I sensed that even in the first session, language and their conceptualization, even at that time, was remarkable, despite [ ] all I was hearing. So the progress to see how they had advanced, and mind you, so quickly, was phenomenal to me.

He stated, however, that the children would "continue to have their struggles for the foreseeable future."

[¶22] Finally, several witnesses gave testimony indicating that, when the Department attempted to reunify the family, the children regressed, and they reacted poorly when Appellants visited them at school. One of J.T.'s and M.T.'s teachers noticed "a lot of regression in behavior" after Ms. Gifford visited, and that J.T. would "have a lot more of the outbursts after the visits at school." On one occasion when J.T. was in fifth grade, she soiled her pants immediately after Appellants visited her at school. Similarly, Ms. Coulter testified that, when Ms. Gifford visited C.T. at school, the frequency and intensity of his aggressive behaviors would often increase.

[¶23] After the State presented its case, Appellants moved for a judgment of acquittal, contending "there is no evidence to show that there's any act or omission which coincided contemporaneously with the requisite mens rea of recklessness, no evidence of causation, and no evidence that the children suffered a cognizable mental injury." The State responded by noting the testimony that the children were underdeveloped, that they failed to meet age-based expectations for social, emotional, and cognitive functioning, and that they were "animalistic in their behaviors ... [and] were severely deficient in several areas." The State also pointed to evidence that the children made significant progress when they were placed in foster care, and regressed when they were reunited with Appellants. Finally, the State contended that there was adequate evidence of recklessness because Appellants were aware of, but consciously disregarded, the advice and services offered by the children's caseworker, their teachers, and their pediatrician. The court denied Appellants' motion.

[¶24] After all the evidence was presented, the jury found Appellants guilty of the crimes charged. The district court sentenced Appellants to terms of three to five years for each count, to be served consecutively, but suspended all but Appellants' first year of confinement in favor of supervised probation. This appeal followed. Additional facts will be set forth as necessary in the discussion below.

## STANDARD OF REVIEW

■ [¶25] We apply the following standard of review to claims of insufficiency of the evidence:

When reviewing the sufficiency of the evidence, this Court accepts as true the State's evidence and affords it those inferences which may be reasonably and fairly drawn from it. We do not consider conflicting evidence or inferences that can be drawn from such evidence. Our duty is to determine whether a quorum of reasonable and rational individuals would, or even could, have come to the same result as the jury actually did.

*Wilkerson v. State*, 2014 WY 136, ¶ 28, 336 P.3d 1188, 1200 (Wyo. 2014).

## DISCUSSION

■ [¶26] In their only issue, Appellants contend the evidence produced at trial was insufficient to sustain their convictions for child abuse under Wyo. Stat. Ann. § 6-2-503(b)(ii) (LexisNexis 2015). The relevant portion of the statute provides as follows:

(b) A person is guilty of child abuse, a felony punishable by imprisonment for not more than ten (10) years, if a person responsible for a child's welfare as defined in W.S. 14-3-202(a)(i) intentionally or recklessly inflicts upon a child under the age of eighteen (18) years:

. . .

(ii) Mental injury as defined in W.S. 14-3-202(a)(ii)(A)[.]

"Mental injury," in turn, is defined as "an injury to the psychological capacity or emotional stability of a child as evidenced by an observable or substantial impairment in his ability to function within a normal range of performance and behavior with due regard to his culture." Wyo. Stat. Ann. § 14-3-202(a)(ii)(A).

A person acts recklessly when he consciously disregards a substantial and unjustifiable risk that the harm he is accused of causing will occur, and the harm results. The risk shall be of such nature and degree that disregarding it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation[.]

Wyo. Stat. Ann. § 6-1-104(a)(ix).

[¶27] Appellants do not dispute that each of the children suffered mental injury as that term is defined in Wyo. Stat. Ann. § 14-3-202(a)(ii)(A). Each of the children has been found to have significant deficits in their social and behavioral development, and both J.T. and M.T. have been diagnosed with attention deficit disorders. Appellants contend, however, that they were not aware of the risk of injury to the children and that, as a result, they did not consciously disregard the risk. According to Mr. Tibbets, he "did not perceive and consciously disregard the risk" of mental injury. Similarly, Ms. Gifford claims "the record is devoid of testimony that Ms. Gifford truly understood the risk of harm her parenting style exposed her children to." We disagree.

[¶28] Appellants rely principally on the testimony of Dr. Bowers. Appellants note that Dr. Bowers testified that she believed Appellants did not intend to harm the children and that they "wanted to care for their kids." Appellants also note that Dr. Bowers testified that she did not think Appellants were acting out of ill-will. We note, initially, that Appellants' argument conflates the "recklessness" required by Wyo. Stat. Ann. § 6-2-503(b)(ii) with the alternative statutory requirement of "intent" to cause harm. The jury could have agreed with Appellants' claims that they did not intentionally harm their children, but still have found that Appellants consciously disregarded their children's wellbeing. Recklessness does not require knowledge that a particular harm is certain to occur. As noted by one prominent authority:

"Recklessness" in causing a result exists when one is aware that his conduct *might* cause the result, though it is not substantially certain to happen. . . . Thus, while "knowledge" and the knowing-type of "intention" require a consciousness of almost-certainty, recklessness requires a consciousness of something far less than certainty or even probability.

1 Wayne R. LaFave, *Substantive Criminal Law* § 5.4 (2d ed.) (emphasis in original); *see*

*also Wilkerson,* ¶¶ 23-24, 336 P.3d at 1198—99; *O'Brien v. State,* 2002 WY 63, ¶¶ 18, 22-25, 45 P.3d 225, 232—34 (Wyo. 2002).

[¶29] Turning, then, to the testimony upon which Appellants rely, we note that Dr. Bowers' statements about Appellants' intentions were made in response to questioning about why she did not take protective custody of the children. The context of those statements undermines Appellants' claim that they did not understand the risk of harm:

> I have asked myself [why I did not seek protective custody for the children] many times. I felt that ... both of these parents wanted to care for their kids; had a good understanding of what [ ] their physical, emotional and nutritional needs would be; [ ] they had more than enough mental equipment and a lot of life experience, a lot of which they had told me about.... And I wanted to be able to work with them to make it better, and for some reason kept thinking that that would work.

Dr. Bowers' statements that Appellants had a "good understanding" of the needs of their children, and had "more than enough mental equipment" to meet those needs, belie Appellants' claims that they did not appreciate the risk of injury to the children.

[¶30] Dr. Bowers further testified that Appellants' failure to provide proper care for the children resulted, not from a lack of understanding, but rather from Appellants' stubbornness and pride. She stated that Mr. Tibbets was "very" stubborn and that she had "increasing concerns that [Mr. Tibbets'] pride and [Ms. Gifford's] pride were sometimes greater than their ability to care, or to accept services, or to acknowledge where their ability to parent fell short." When asked what prevented Appellants from providing the proper care for their children, Dr. Bowers stated "I know [Mr. Tibbets] is very busy, that he was working out of town.... [B]ut I think that for both parents, their priorities did not place their children first."

[¶31] As noted above, Dr. Bowers diagnosed M.T. with non-organic failure to thrive due to the fact that he was not being fed often enough. She thought that M.T.'s condition was severe enough to warrant hospitalization, but she stated:

[I]t was my impression that these parents were—had lots of tools at their disposal; that they were—they were intelligent people that understood the problem, and so I persevered in encouraging them in how to feed [M.T.], how to get him to gain weight, and the importance of doing so. And I would continue to be confident that they understood that and would do so.

Again, Dr. Bowers' testimony contradicts Appellants' claims that they did not perceive the risk of injury to their children.

[¶32] Three years later, after C.T. was born, Dr. Bowers diagnosed C.T. with non-organic failure to thrive due to the fact that he was significantly underweight. As with M.T., Dr. Bowers concluded that C.T.'s condition was the result of malnutrition. Appellants continued to use the mixture of molasses and whipping cream to feed C.T., despite Dr. Bowers' advisement to feed C.T. baby formula. She stated that she clearly communicated C.T.'s needs to Appellants, and that they understood the consequences of malnutrition. She stated she did not know why Appellants did not give the children baby formula, which was available for free in her office. Dr. Bowers again stated "I felt that they had more than enough intellectual equipment, that they were smart people who understood the concern and the issue." Despite Dr. Bowers' clear communication of the risks of malnutrition, C.T. was subsequently hospitalized for a week on two separate occasions for failure to thrive. Dr. Bowers also testified that Appellants failed to seek or receive additional services that might have helped C.T. recover from his hypoxic injuries. Dr. Bowers attempted to convince Appellants that C.T. needed a pediatric ophthalmologist to address his reduced vision and a pediatric neurologist to address his seizures. Appellants, however, sought no treatment for either condition, and by the time C.T. was placed in foster care nearly five years later, he was having between six and eight seizures per day.

[¶33] The record reveals that Appellants ignored continued efforts to help them meet the needs of their children. Appellants rejected parenting services offered by the Department, rejected Dr. Bowers' medical advice,

failed to comply with safety plans for C.T., and rejected offers of assistance in cleaning their home and making structural repairs to the house. The State produced ample evidence that, through numerous interactions with Department personnel and others offering assistance, Appellants were put on notice of the fact that they were providing an unsafe and unhealthy home environment, and that they were failing to meet the children's nutritional, medical, and emotional needs. Considering Appellants' repeated failure to accept the advice and services of medical and educational professionals, and the evidence indicating their understanding of the children's needs, we find sufficient evidence in the record to show that Appellants acted in conscious disregard of a substantial and unjustifiable risk of harm.

[¶34] Mr. Tibbets presents an additional argument. He contends the State did not provide sufficient evidence to show that the risk of injury to the children was a "substantial and unjustifiable risk" as required under Wyo. Stat. Ann. § 6-2-503(b)(ii). As part of this claim, however, Mr. Tibbets asserts the State did not show that his disregard of the risk of injury to his children occurred at the same time of the acts giving rise to the children's injuries. Mr. Tibbets asserts that "although [the Department] was aware that the condition of the house, the monitoring of the children, and other issues were substandard and potentially dangerous, the Department [ ] did not feel that there was a substantial and unjustifiable risk" that Appellants were causing mental injury to the children until October 2012, when the children were removed from the home. We do not agree.

[¶35] To the extent Mr. Tibbets claims the evidence showing that he failed to provide adequate nutrition for the children, address the children's basic medical needs, keep his home clean of rotting garbage, feces, and urine, teach his children basic life skills, or follow professional medical advice was insufficient to create a substantial risk of harm to the children, we are not persuaded. As noted in the authority quoted above,

A risk does not have to be "more likely than not to occur" or "probable" in order to be substantial. A risk may be substantial even if the chance that the harm will occur is well below fifty percent. . . . Some risks may be substantial even if they carry a low degree of probability because the magnitude of the harm is potentially great.

1 LaFave, *Substantive Criminal Law* § 5.4 (quoting *People v. Hall*, 999 P.2d 207, 217 (Colo. 2000)). The State produced sufficient evidence to show that the risk of injury to Appellants' children was substantial and unjustifiable.

[¶36] We also disagree with Mr. Tibbets' claim that the State produced insufficient evidence to demonstrate that his reckless disregard of the risk of harm coincided with the acts giving rise to the children's injuries. The State alleged that Mr. Tibbets recklessly inflicted mental injury on his children over the lifetime of each of the children. The State's theory of the case was that the mental injury experienced by the children stemmed, not from a single event, but from the slow accretion of continued exposure to neglect and inhospitable living conditions. Mr. Tibbets has presented no argument or authority indicating that the abuse contemplated by Wyo. Stat. Ann. § 6-2-503(b)(ii) must occur contemporaneously with a single reckless act. Further, the Department's efforts to address the children's needs while they lived in Appellants' home do not show, as Mr. Tibbets suggests, that the State did not feel the risk of harm was substantial until the time at which the children were placed in protective custody. If anything, the Department's efforts to provide remedial parenting services, to maintain a safe environment in Appellants' home, and to facilitate the provision of medical and therapeutic services for the children demonstrate its concern about the possibility of long-term consequences for the children's health and safety.

[¶37] Affirmed.