# THE SUPREME COURT, STATE OF WYOMING

# 2024 WY 137

OCTOBER TERM, A.D. 2024

December 20, 2024

CAROLYN AUNE,

Appellant
(Defendant),

v.                                                                  S-24-0079

THE STATE OF WYOMING,

Appellee
(Plaintiff).

---

*Appeal from the District Court of Park County*
*The Honorable Bobbi Dean Overfield, Judge*

*Representing Appellant:*

    *Office of the State Public Defender: Brandon Booth\*, State Public Defender; Kirk A. Morgan, Chief Appellate Counsel.  Argument by Mr. Morgan.*

*Representing Appellee:*

    *Bridget Hill, Attorney General; Jenny L. Craig, Deputy Attorney General; Kristen R. Jones, Senior Assistant Attorney General; Donovan Burton, Assistant Attorney General.  Argument by Mr. Burton.*

    *\*An Order Substituting Brandon Booth for Ryan Roden was entered on October 10, 2024.*

*Before FOX, C.J., and BOOMGAARDEN, GRAY, FENN, and JAROSH, JJ.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third.  Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**FENN, Justice.**

[¶1]    Following a nine-day trial, a jury found Carolyn Aune guilty of one count of murder in the first degree for committing the crime of child abuse which resulted in the death of PW.  Ms. Aune appeals claiming the evidence was insufficient to prove she recklessly inflicted a physical injury on PW.  She also asserts the prosecutor committed misconduct by misstating the law during his opening statement and closing argument.  We affirm.

## ISSUES

[¶2]    Ms. Aune raises two issues, which we rephrase as follows:

> I.    Did the State present sufficient evidence to support a conviction for felony child abuse as a requisite offense for murder in the first degree?
>
> II.    Did the prosecutor commit prosecutorial misconduct by misstating the law in his opening statement and closing argument?

## FACTS

**The Child's Injuries and Death**

[¶3]    Just after noon on March 27, 2021, Moshe Williams brought his two-year old daughter, PW, to the emergency room at Cody Regional Health.  PW was unresponsive.  Hospital staff immediately suspected PW was the victim of child abuse, and they contacted law enforcement to investigate.

[¶4]    Hospital staff discovered PW had bruising on her lower back, buttocks, and legs.  She also had scrapes on her chin and scalp, thinning hair, and bruising on her scalp that was consistent with her hair having been pulled with great force.  PW also had bruising in and around one of her eyes.  A CT scan revealed she had a cervical fracture, a rib fracture, a hematoma on her buttock, and part of her small intestine had been transected.  The CT scan also showed a fractured clavicle from a previous injury, for which PW had received treatment on March 7, 2021.  PW was in septic shock from the contents of her transected bowel leaking within her abdominal cavity.

[¶5]    PW needed more care than the Cody hospital could provide, so her doctors arranged for her to be life-flighted to Children's Hospital in Denver.  Upon arriving at the Cody airport, PW went into cardiac arrest.  The paramedics resuscitated PW and brought her back to Cody Regional Health for further treatment.  After additional stabilizing measures, PW was life-flighted to Children's Hospital.

1

[¶6]    Immediately upon her arrival at Children's Hospital, PW was taken to the operating room, where doctors had to remove the portion of her small intestine that had been transected and a portion of her colon. The doctors believed the injury to PW's small intestine was the result of blunt force trauma that had occurred 24–48 hours before her surgery took place. On March 31, 2021, PW's right leg had to be partially amputated due to complications from the life-saving measures that were implemented to stabilize her for transport. At some point, PW suffered an anoxic brain injury from a lack of oxygen to her brain. By April 1, 2021, an MRI determined PW had limited to no brain activity. PW was taken off life support, and she died on April 4, 2021.

[¶7]    The autopsy determined PW died due to blunt force trauma to the upper abdomen that ruptured her duodenum where it joins the jejunum. The forensic pathologist opined the blow was likely caused by a "really hard punch to the gut," knee drop, or elbow drop to the abdomen that compressed PW's intestine against her vertebral column, causing it to rupture. He also opined the force necessary to cause such an injury meant it was likely caused by an adult. As a result of the duodenal injury and delay in seeking medical treatment, PW became septic, her organs began to fail, she went into cardiac arrest, eventually suffered brain death, and died. PW did not have a bone disease that caused any of the fractures, nor did she have any preexisting bowel disease that could have caused the bowel transection in the absence of trauma. The forensic pathologist concluded PW's injuries were likely the result of abuse, and PW's death was a homicide.

**The Investigation**

[¶8]    Officers interviewed Mr. Williams at the hospital, but he provided no explanation for PW's injuries other than she might have fallen out of her toddler bed. Neither law enforcement nor the doctors believed PW's injuries could have been caused by falling out of bed. Mr. Williams informed the officers he lived with his girlfriend, Carolyn Aune, his two children, PW and MW, and Ms. Aune's three children, EM, RA, and KA, in a three-bedroom apartment. Sergeant Juston Wead was concerned PW had been the victim of child abuse, and he arranged for Mr. Williams to come to the law enforcement center for an interview. During his interview, Mr. Williams repeatedly denied inflicting any injuries on PW, and he claimed he did not know how her injuries occurred.

[¶9]    Officer Mark Martinez was sent to interview Ms. Aune to determine if she had any information about the cause of PW's injuries. Officer Martinez interviewed Ms. Aune at the apartment she shared with Mr. Williams, before asking her to come to the law enforcement center for additional questioning. Ms. Aune provided no explanation for how PW's injuries occurred. Ms. Aune stated twice she never saw anyone, including Mr. Williams, physically harm PW.

[¶10] On April 1, 2021, the State charged Mr. Williams and Ms. Aune with aggravated child abuse in a joint information. After PW's death, the State amended the charge to murder in the first degree. In January 2023, the district court granted Ms. Aune's motion to sever her trial from Mr. Williams's.

**The Trial**

[¶11] In its opening statement, the State informed the jury it was prosecuting Ms. Aune under two alternative theories. Under the first theory, the State asserted Ms. Aune intentionally caused physical injury to PW by doing the act that led to her death. Under the second theory, the State asserted Ms. Aune caused physical injury to PW by recklessly doing the act that led to her death. Specifically, the State alleged Ms. Aune was a person responsible for PW's welfare, and she failed to get prompt medical attention for PW, which led to the child's death. The State asserted it was the delay in care that cost PW her life, and without this delay in care, the abdominal injury likely would not have been fatal.

[¶12] The State presented evidence that PW's injury occurred sometime between an earlier doctor's appointment for a follow up on her fractured clavicle on March 25, 2021, and her presentation to the emergency room on March 27, 2021. The State presented evidence showing PW was in Mr. Williams's and/or Ms. Aune's care during that time. According to their cell phone records, Mr. Williams and Ms. Aune were together at their apartment for most of this time, but there were times when one or the other of them left the apartment for various reasons. Both Mr. Williams and Ms. Aune had the opportunity to cause the abdominal injury to PW.

[¶13] At the trial, Ms. Aune testified she witnessed Mr. Williams inflict an abdominal injury on PW. She testified on the evening of March 26, 2021, she and Mr. Williams gave PW and Ms. Aune's two youngest children a bath. After the bath, PW threw up and Mr. Williams took her back into the bathroom. Ms. Aune testified she heard a whining sound and a loud banging coming from the bathroom. When she went to the bathroom to see what was going on, she saw PW leaning over the toilet with her forehead "inside the toilet water," and PW's feet were not touching the ground. Mr. Williams was standing at the end of the bathtub, not directly beside the toilet. Ms. Aune grabbed PW from the toilet and laid her down on some laundry in front of the washer and dryer. Ms. Aune asked Mr. Williams what was going on, and he told her it was none of her business. They then engaged in a physical altercation where they shoved each other, and Ms. Aune hit Mr. Williams twice in the chest. Ms. Aune saw her oldest daughter coming into the bathroom, so Ms. Aune exited the bathroom and walked into the hallway. While she was in the hallway, Ms. Aune heard a slight movement that caused her to turn around. Ms. Aune testified she saw Mr. Williams stomp on PW's abdomen with the heel of his right foot. Although PW did not cry, the force of the blow was enough to make her exhale air from her mouth. After witnessing this event, Ms. Aune walked back into the living room and continued with her normal nighttime routine with her children. This routine included Ms. Aune and Mr.

Williams tucking the children into bed and praying with them before retiring to their respective sleeping areas. She testified she did not call 911 or suggest Mr. Williams take PW to the hospital because she thought PW was fine.

[¶14] Around 6:00 a.m. on the morning of March 27, 2021, Ms. Aune went to wake up her children. She noticed PW had been ill, and it looked like "her pullup just exploded" with diarrhea. Ms. Aune woke up Mr. Williams, and he came to clean up PW and give her a bath. Ms. Aune did not pay any attention to PW after that, and she focused on getting her three children ready to leave for a previously scheduled appointment. While she was at her appointment, Ms. Aune texted Mr. Williams to see if he had taken PW to the hospital, and he said he had not. A short time later, Mr. Williams texted Ms. Aune saying PW probably had a stomach bug and was sleeping.

[¶15] When Ms. Aune returned to the apartment, Mr. Williams left to go to Walmart to get some Pepto Bismol and Tums for PW. Ms. Aune testified she did not check on PW at all while Mr. Williams was gone because he had texted her that PW was sleeping. Ms. Aune testified if she had checked on PW and noticed something was wrong, she would have called 911. When Mr. Williams returned to the apartment, he went into PW's room to give her the medicine, but when he came out, he said she was unresponsive, and he was going to take her to the hospital.

[¶16] Ms. Aune denied inflicting any injury on PW, and she claimed she did not know how badly PW had been injured by Mr. Williams. Ms. Aune testified she "trusted" Mr. Williams would take PW to the hospital the next day, even after she witnessed him stomp on PW's stomach, because he was "still her dad." She testified she "wished" she had made sure PW had gotten to the hospital earlier instead of going to her previously scheduled appointment.

[¶17] Three medical experts testified prompt medical care was essential in this case, and PW would not have died if she had been brought in immediately after the injury had occurred. Numerous witnesses testified it would have been obvious to a reasonable caregiver PW needed medical attention for several hours before she was actually brought into the hospital. The State's child abuse expert opined a reasonable caregiver would have attempted to seek medical care for PW. One lay witness opined a reasonable caregiver would have checked on a napping child who had been vomiting repeatedly because her life might be at risk.

[¶18] In its closing argument, the State went through the jury instruction containing the statutory definition of physical injury. The State pointed out that the various examples of harm listed in the definition included acts of commission and one specific example of an act of omission, substantial malnutrition. The State's first theory of liability required the jury to find Ms. Aune intentionally inflicted the injury on PW. The State argued if the jury believed Ms. Aune's testimony, then they should acquit her under this theory because it

4

was Mr. Williams who "did it." However, if the jury determined Ms. Aune was lying, the State asked the jury to convict her under this theory because "[t]here's nobody else there" who could have done it.

[¶19] For its second theory of liability, the State alleged Ms. Aune had a duty of care to PW, as a person responsible for the child's welfare, and Ms. Aune recklessly inflicted harm on PW by failing to get her medical attention promptly, which was an act of omission. The State asserted if the jury believed Ms. Aune's testimony that she saw Mr. Williams stomp on PW's stomach around 7:30 p.m. on March 26, 2021, and she took no steps to get PW medical treatment after that injury, then the State argued she was guilty under the State's second theory:

> However, even if she's not guilty of intentional infliction of physical injury, by her own testimony, if you believe it, she saw Moshe Williams strike the fatal blow, and that goes to the second theory of liability, clear delineation, intentional[,] reckless, one, two. Two does not depend on who struck the fatal blow. Two is only based on that she recklessly failed to get prompt medical treatment for [PW]. If she didn't do what a reasonable person responsible for the welfare of a child would have done, with the knowledge that she had, she's guilty, regardless of who struck the fatal blow. It is that simple.

[¶20] The State asserted the jury had to determine whether Ms. Aune intentionally struck the fatal blow or knowing the fatal blow had been struck, recklessly failed to get prompt medical attention for PW. The State argued PW died due to a transected duodenum that was not promptly treated, and absent the delay in care, PW would not have died.

[¶21] Using a special verdict form, the jury unanimously found Ms. Aune recklessly inflicted physical injury on PW and was guilty of murder in the first degree. The district court sentenced Ms. Aune to life according to law. This appeal timely followed.

## **DISCUSSION**

### I. *Did the State Present Sufficient Evidence to Sustain a Conviction for Child Abuse as a Requisite Offense for Murder in the First Degree?*

[¶22] Ms. Aune asserts the verdict in this case cannot stand because the evidence is insufficient to support her conviction beyond a reasonable doubt. Ms. Aune does not challenge the State's contention that her failure to seek prompt medical care for PW violated a duty of care and was reckless. Instead, she argues this act of omission does not constitute "inflicting" a physical injury under Wyoming Statute § 6-2-503(b)(i)

5

(LexisNexis 2021). Consequently, she argues it cannot constitute a requisite offense for murder in the first degree.

[¶23] Our standard of review for claims challenging the sufficiency of the evidence to sustain a conviction is well established:

> we assume that the State's evidence is true, disregard any evidence favoring the defendant, and give the State the benefit of every favorable inference that may reasonably be drawn from the evidence. After examining the State's evidence, whether direct or circumstantial, we do not substitute our judgment for that of the jury, but instead, we determine whether a jury could have reasonably concluded each of the elements of the crime was proven beyond a reasonable doubt. Furthermore, we defer to the jury as the fact-finder, and assume the jury believed only the evidence adverse to the defendant since they found the defendant guilty beyond a reasonable doubt. Ultimately, our standard of review is not whether the evidence is sufficient for us, but whether, when viewed favorably to the [S]tate, it was enough on which a jury could form a reasonable inference of guilt beyond a reasonable doubt.

*Munoz v. State*, 2024 WY 103, ¶ 8, 556 P. 3d 238, 240 (Wyo. 2024) (quoting *Hultberg v. State*, 2024 WY 59, ¶ 12, 549 P.3d 759, 761 (Wyo. 2024)).

[¶24] Resolution of this case also requires us to interpret the relevant statutes. "Statutory interpretation is a question of law reviewed de novo." *Bernal-Molina v. State*, 2021 WY 90, ¶ 8, 492 P.3d 904, 907 (Wyo. 2021) (citing *Raczon v. State*, 2021 WY 12, ¶ 8, 479 P.3d 749[, 751] (Wyo. 2021)). "When we interpret statutes, our goal is to give effect to the intent of the legislature, and we 'attempt to determine the legislature's intent based primarily on the plain and ordinary meaning of the words used in the statute.'" *Raczon*, ¶ 8, 479 P.3d at 751 (quoting *Wyo. Jet Ctr., LLC, v. Jackson Hole Airport Bd.*, 2019 WY 6, ¶ 12, 432 P.3d 910, 915 (Wyo. 2019)). "In interpreting a statute, 'we seek the legislature's intent as reflected in the plain and ordinary meaning of the words used in the statute,' giving effect to every word, clause, and sentence." *Bernal-Molina*, ¶ 13, 492 P.3d at 908 (quoting *Blevins v. State*, 2017 WY 43, ¶ 27, 393 P.3d 1249, 1256 (Wyo. 2017)). We will not interpret a statute in a manner that renders any part meaningless. *Id.* (citing *Sena v. State*, 2019 WY 111, ¶ 20, 451 P.3d 1143, 1148 (Wyo. 2019)).

[¶25] The State charged Ms. Aune with murder in the first degree under Wyoming Statute § 6-2-101(a) (LexisNexis 2021), which required the State to prove that while engaged in the perpetration of abuse of a child under the age of 16, Ms. Aune killed a human being.

The elements of the crime of child abuse are set forth in Wyoming Statute § 6-2-503(b), which states:

> (b) A person is guilty of child abuse, a felony punishable by imprisonment for not more than ten (10) years, if a person responsible for a child's welfare as defined in W.S. 14-3-202(a)(i) intentionally or recklessly inflicts upon a child under the age of eighteen (18) years:
>
> > (i) Physical injury as defined in W.S. 14-3-202(a)(ii)(B), excluding reasonable corporal punishment[.]

Wyoming Statute § 14-3-202(a)(ii)(B) (LexisNexis 2021) defines "Physical Injury" as:

> any harm to a child including but not limited to disfigurement, impairment of any bodily organ, skin bruising if greater in magnitude than minor bruising associated with reasonable corporal punishment, bleeding, burns, fracture of any bone, subdural hematoma or substantial malnutrition[.]

"Recklessly" is also defined by statute:

> A person acts recklessly when he consciously disregards a substantial and unjustifiable risk that the harm he is accused of causing will occur, and the harm results. The risk shall be of such nature and degree that disregarding it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation[.]

Wyoming Statute § 6-1-104(a)(ix) (LexisNexis 2021).

[¶26] Ms. Aune argues Wyoming Statute § 6-2-503(b) does not contemplate a defendant recklessly inflicting a physical injury on a child through an act of omission. Based on a dictionary definition of "inflict,"[1] she asserts the statute requires an act of commission, not an act of omission "by simply failing to respond or react." She contends that in all of the statutes where the legislature has used the word inflict, the word means "to directly cause" the prohibited harm, "not simply [] having witnessed the act and breaching a duty of care to respond." She contends the legislature never intended to include neglecting a duty of care within the child abuse statute.

---

[1] Appellant cited to Merriam Webster's definition of inflict: "(A) to give by or as if by striking; (B) to cause (something unpleasant) to be endured." https://www.meriam-webster.com/dictionary/inflict.

7

[¶27] The State agrees with Ms. Aune that under the common definition of "inflict," the State needed to prove the defendant "caused" physical injury. However, the State asserts the legislature intentionally used broad language to define "physical injury," and the plain language of Wyoming Statute § 6-2-503(b) applies to both acts of commission and omission which cause physical injury. We agree with the State.

[¶28] We have long recognized "[t]he State of Wyoming has 'a strong public policy of protecting children from child abuse.'" *Elmore v. Van Horn*, 844 P.2d 1078, 1082 (Wyo. 1992) (citation omitted). Because child abuse statutes are protective in nature, "they are designed to cover a broad spectrum of conduct." *Keser v. State*, 706 P.2d 263, 268 (Wyo. 1985). "There is an infinite variety of conduct which may be involved in order to safeguard the welfare of the children." *Id.* Consequently, child abuse statutes "must be broadly drawn and reasonably definite in the area of legislation involved so that an ordinary person would know the conduct prescribed." *Id.* (citing *Commonwealth v. Marlin*, 305 A.2d 14, 18 (Penn. 1973)).

[¶29] We have also recognized "[t]he right to have children does not include a corresponding right to abuse them by **omission or commission**." *Keser*, 706 P.2d at 268 (citing *People in Interest of CL*, 356 N.W.2d 476, 478 (S.D. 1984)) (emphasis added). This same principle has been recognized by other jurisdictions. *See, e.g., Nicholson v. State,* 600 So. 2d 1101, 1104 (Fla. 1992) (holding willful acts of omission were included under Florida's child abuse statute); *Phelps v. State*, 439 So. 2d 727, 734– 35 (Ala. Crim. App. 1983) (finding the Alabama child abuse statute encompassed acts of omission including a mother's failure to prevent the future abuse of her son). Unlike other state's statutes, Wyoming Statute § 6-2-503(b) does not specifically include the words "act or omission."[2] However, the legislature's intent to encompass acts of omission is clear from its inclusion of "substantial malnutrition" in the definition of physical injury. Wyo. Stat. § 14-3-202(a)(ii)(B). Substantial malnutrition is an injury that is likely to be caused by repeated acts of omission rather than commission. *See Dewitt v. State*, 917 P.2d 1144, 1147, 1149 (Wyo. 1996) (stating substantial malnutrition was caused from the infant receiving insufficient calories due to the mother's failure to feed her properly for several months). The statutory definition of "physical injury" contains both a list and "a catch-all description." *Sanderson v. State*, 2007 WY 127, ¶ 45, 165 P.3d 83, 95 (Wyo. 2007). "[T]o fall under the statute's 'catch-all description,' the harm must be 'the same general kind or class as those specifically listed' in the statute." *Hultberg*, 2024 WY 59, ¶ 15, 549 P.3d at 762 (quoting *Sanderson*, ¶ 45, 165 P.3d at 95). Therefore, other harms of the same general

---

[2] *See, e.g.,* Ark. Code Ann. § 9-30-103(2)(B) (West 2017) (defining child abuse as encompassing "both acts and omissions"); Haw. Rev. Stat. Ann. § 350-1 (West 2022) (defining child abuse to include the "acts or omissions" of a person responsible for the child's care); Mich. Comp. Laws Ann. § 750.136b(3)(a) (West 2020) (stating a person is guilty of child abuse in the second degree if that person's omission "causes serious physical harm or serious mental harm to a child"); W. Va. Code Ann. § 49-1-201 (West 2018) (defining child abuse to include "acts or omissions").

kind or class as those listed in the statute which are caused by similar acts of omission would fall within the child abuse statute.

[¶30] At least two of our previous child abuse cases involved injuries recklessly inflicted through acts of omission. In *DeWitt v. State*, the defendant was convicted of child abuse for recklessly inflicting substantial malnutrition on her eight-month-old baby. 917 P.2d at 1147, 1149. The evidence at trial established the defendant failed to properly feed her infant over the course of several months, despite knowing it was her responsibility to feed the infant, and the baby would starve if she was not fed. *Id.* at 1149. The defendant also had not taken the infant to a doctor since birth. *Id.* We sustained the defendant's child abuse conviction, concluding the State presented sufficient evidence she recklessly inflicted physical injury on her child, even though these were acts of omission. *Id.*

[¶31] The case of *Gifford v. State* involved acts of omission by the co-defendant, Mr. Tibbets. 2017 WY 93, ¶¶ 35–36, 399 P.3d 1240, 1248 (Wyo. 2017). Mr. Tibbets was convicted of recklessly inflicting mental injury on his children throughout their lifetimes. *Id.* at ¶¶ 12, 24, 399 P.3d at 1243, 1245. These injuries occurred in part from Mr. Tibbets's failure "to provide adequate nutrition for the children, address the children's basic medical needs, keep his home clean of rotting garbage, feces, and urine, teach his children basic life skills, or follow professional medical advice . . . ." *Id.* at ¶ 35, 399 P.3d at 1248. The mental injuries resulted from "the slow accretion of continued exposure to neglect and inhospitable living conditions." *Id.* at ¶ 36, 399 P.3d at 1248. We sustained his conviction for mental injuries he recklessly inflicted on his children through numerous acts of omission. *Id.* at ¶¶ 36–37. Therefore, as evidenced by our holdings in *DeWitt* and *Gifford*, our caselaw recognizes Wyoming Statutes §§ 6-2-503(b) and 14-3-202(a)(ii)(B) apply to physical or mental injuries inflicted through acts of omission and commission.

[¶32] Having found Wyoming Statutes §§ 6-2-503(b) and 14-3-202(a)(ii)(B) apply to physical injuries inflicted through acts of omission, we must determine if the State presented sufficient evidence showing Ms. Aune recklessly inflicted a physical injury on PW. Ms. Aune asserts "not providing prompt medical treatment does not constitute 'physical injury.'" The State asserts it never "alleged [Ms.] Aune's failure was the injury— it alleged her failure caused the injuries." Under its second theory, the State did not allege Ms. Aune intentionally inflicted the abdominal injury. Rather, it alleged Ms. Aune inflicted or caused PW to suffer sepsis, organ failure, and death through her failure to seek medical treatment.

[¶33] In this case, the State presented uncontroverted evidence from three medical experts that PW's abdominal injury would not have been fatal if she had received prompt medical treatment. Because her abdominal injury and transected bowel were not promptly treated, PW became septic, went into cardiac arrest, suffered an anoxic brain injury, had to have her leg amputated, suffered brain death, and ultimately died. Those harms certainly fall within the definition of "physical injury" under Wyoming Statutes §§ 6-2-503(b) and 14-

9

3-202(a)(ii)(B). The amputation would constitute "disfigurement." The cardiac arrest, anoxic brain injury, and brain death would fall under "impairment of any bodily organ." The evidence further established these physical injuries were directly caused by the delay in medical care.

[¶34] Ms. Aune concedes "the State proved [she] had a duty of care and recklessly breached that duty 'by failing to get PW medical attention promptly, an act of omission.'" Even without this concession, the State presented sufficient evidence to prove Ms. Aune's recklessness. Multiple witnesses testified it would have been obvious to a reasonable caregiver that PW needed medical care. The State presented evidence showing a reasonable caregiver would have attempted to seek medical care for PW. Ms. Aune testified she witnessed Mr. Williams stomp on PW's abdomen with his heel. Yet she did nothing. She did not call 911, suggest Mr. Williams take PW to the hospital immediately, or take PW to the hospital herself. The jury could reasonably conclude Ms. Aune consciously disregarded a substantial and unjustifiable risk that the harm she was accused of causing would occur, and that harm did indeed occur. *See* Wyo. Stat. Ann. § 6-1-104(a)(ix). The jury could further reasonably conclude the risk Ms. Aune disregarded was "of such nature and degree that disregarding it constitute[d] a gross deviation from the standard of conduct that a reasonable person would observe in the situation[.]" *Id.* Consequently, the jury could reasonably conclude Ms. Aune recklessly inflicted a physical injury on PW, through her failure to seek medical care for PW.

[¶35] The State presented sufficient evidence to establish Ms. Aune abused a child under the age of 16 when she recklessly inflicted several physical injuries on PW by failing to seek prompt medical care for the child after witnessing Mr. Williams inflict the abdominal injury. Wyo. Stat. Ann. § 6-2-503(b); Wyo. Stat. Ann. § 6-2-101(a). PW died as a result of the injuries inflicted by this lack of prompt medical care. Consequently, the State presented sufficient evidence to sustain Ms. Aune's conviction for murder in the first degree. *See* Wyo. Stat. Ann. § 6-2-101(a).

### II. *Did the Prosecutor Commit Misconduct by Misstating the Law?*

[¶36] Ms. Aune alleges the prosecutor committed misconduct by informing the jury the crime of child abuse could be committed through an act of omission, and Ms. Aune could be convicted of this crime for violating the duty of care she owed to PW. Relying on *Yellowbear v. State*, 2008 WY 4, ¶ 57, 174 P.3d 1270, 1292–93 (Wyo. 2008), she further argues the prosecutor's statements violated a clear rule of law because this Court has held it is erroneous for the district court to instruct the jury as to a "parental duty" to do whatever may be reasonably necessary for the care and safety of their children.

[¶37] "Prosecutorial misconduct is 'a prosecutor's improper or illegal act (or failure to act), especially involving an attempt to persuade the jury to wrongly convict a defendant or assess an unjustified punishment.'" *Sanchez v. State*, 2024 WY 80, ¶ 12, 552 P.3d 399,

404 (Wyo. 2024) (quoting *Soares v. State*, 2024 WY 39, ¶ 30, 545 P.3d 871, 878–79 (Wyo. 2024). Prosecutorial misconduct "claims are intended 'to address gross prosecutorial improprieties that have deprived a criminal defendant of his or her right to a fair trial.'" *Id.* (quoting *Soares*, ¶ 30, 545 P.3d at 879). Ms. Aune did not raise a prosecutorial misconduct claim below, so we review for plain error. *Id.* (citing *Soares*, ¶ 29, 545 P.3d at 878). To establish plain error, Ms. Aune must prove: "'1) the record clearly reflects the incident urged as error; 2) a violation of a clear and unequivocal rule of law; and 3) that [s]he was materially prejudiced' by the alleged error." *Id.* (quoting *Soares*, ¶ 18, 545 P.3d at 877). "Failure to establish any of the three elements precludes a finding of plain error." *Id.* (citing *Soares*, ¶ 18, 545 P.3d at 877).

[¶38] The first step of the plain error test is met here because the alleged errors appear in the record. *Id.* at ¶ 13, 552 P.3d at 404. The second step of the plain error analysis requires Ms. Aune to prove the prosecutor's statements violated a clear and unequivocal rule of law in a clear and obvious, not merely arguable, way. *Id.* (citing *Mendoza v. State*, 2021 WY 127, ¶ 13, 498 P.3d 82, 85 (Wyo. 2021)). "Our law is clear that prosecutors may not misstate the law." *Id.* (citing *Mendoza*, ¶ 13, 498 P.3d at 85).

[¶39] The prosecutor in this case did not misstate the law. As discussed above, Wyoming Statutes §§ 6-2-503 and 14-3-202(a)(ii)(B) specifically contemplate situations where a person may "inflict" a physical injury on a child through an act of omission. The prosecutor's statements to this effect in his opening statement and closing argument accurately recited the law. Furthermore, Wyoming Statute § 6-2-503 specifically intends to punish physical injuries that are "recklessly" inflicted. The prosecutor carefully guided the jury through the instructions containing the statutory elements and definitions. He did not misstate any of those elements.

[¶40] Unlike *Yellowbear*, the prosecutor in this case did not attempt to add an additional parental duty element to the statute. In *Yellowbear*, the State charged the defendant with aiding or abetting the crimes of child abuse and felony murder because the defendant knew the child had been abused in the past, knew there was imminent danger to the child's health or welfare, and "took no action to protect the child from the abuser[.]" 2008 WY 4, ¶¶ 48, 51, 54, 174 P.3d at 1289–91. The district court instructed the jury: "It is the duty of a parent to protect their children and to do whatever may be reasonably necessary for their care and their safety." *Id.*, 174 P.3d at 1291–92. We found the district court erred when it gave this instruction because "neither the crime of child abuse nor the crime of accessory before the fact contain[ed] **that duty** as an element . . . ." *Id.* at ¶¶ 55, 57, 174 P.3d at 1292–93 (emphasis added). Our concern in *Yellowbear* was the manner in which the alternative theories of the crime were presented to the jury. *Id.* at ¶¶ 54–60, 174 P.3d at 1291–93. We were concerned that due to the way the jury was instructed, the defendant might be convicted of aiding and abetting for merely being present at the scene of the crime, rather than for being an active participant. *Id.* However, these concerns were addressed through a special verdict form wherein the jury specifically found the defendant was a participant.

*Id.* at ¶ 58, 174 P.3d at 1293. The jury found the defendant's actions in that case were "crimes of commission," not crimes of omission or a lapse in the duty of parental care to protect one's child. *Id.* We did not hold in *Yellowbear* that a breach of some other duty through an act of omission could never be the basis for a child abuse conviction.

[¶41] Unlike the prosecutor in *Yellowbear*, the State did not assert Ms. Aune had some general duty to protect PW from Mr. Williams. Instead, he asserted Ms. Aune's failure to seek care for PW deviated from the standard of conduct a reasonable person would have observed in the same situation. This was part of what he was required to prove in order to establish Ms. Aune acted recklessly. *See* Wyo. Stat. Ann. § 6-1-104(a)(ix). According to Ms. Aune's own testimony, she witnessed Mr. Williams inflict what proved to be a serious injury to PW's abdomen. Ms. Aune admits she had a duty to get prompt medical care for PW, and she recklessly breached this duty by failing to do so. PW suffered numerous additional injuries and died as a result of this failure to seek prompt medical care.

[¶42] As discussed above, we have sustained child abuse convictions based on a parent's violation of the duty to provide adequate nutrition, and a parent's failure to address his children's basic medical needs, keep his home clean of rotting garbage, feces, and urine, teach his children basic life skills, or follow professional medical advice. *See DeWitt*, 917 P.2d at 1149; *Gifford*, 2017 WY 93, ¶ 35, 399 P.3d at 1248. The prosecutor did not misstate the law by arguing a person responsible for a child's welfare can recklessly commit child abuse by failing to act when she has a responsibility to act, knows her failure to act will create a substantial risk to the child, and that failure is a gross deviation from a standard of reasonable conduct. *See Dewitt*, 917 P.2d at 1149; *Gifford*, ¶¶ 28, 35, 399 P.3d at 1246–48. Because Ms. Aune failed to establish the prosecutor violated a clear and unequivocal rule of law, she also failed to establish the district court committed plain error.

## CONCLUSION

[¶43] Wyoming Statutes §§ 6-2-503 and 14-3-202(a)(ii)(B) specifically contemplate situations where a person who is responsible for a child's welfare may "inflict" a physical injury on that child through an act of omission. The State presented sufficient evidence to show Ms. Aune recklessly inflicted physical injuries on PW through her failure to seek prompt medical attention for PW. Because PW died as the result of the child abuse inflicted upon her by Ms. Aune, the evidence is sufficient to sustain Ms. Aune's conviction for murder in the first degree. The prosecutor correctly recited the law and did not commit misconduct in his opening statement or closing argument. Affirmed.